UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

```
UNITED STATES OF AMERICA      :
                              :  CRIMINAL ACTION NO.
                              :
          VERSUS              :  3:15-CR-00173-BAJ-EWD
                              :
                              :  HON. BRIAN A. JACKSON
JESSE ALLEN BURCHAM           :
                              :  AUGUST 8, 2016
```

TRANSCRIPT OF SUPPRESSION HEARING

A P P E A R A N C E S:

FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

          JAMIE FLOWERS, ESQ.
          ASSISTANT U.S. ATTORNEY
          777 FLORIDA STREET
          BATON ROUGE, LA 70802

FOR THE DEFENDANT, JESSE ALLEN BURCHAM:

          JOHN DIGIULIO, ESQ.
          ATTORNEY AT LAW
          8075 JEFFERSON HIGHWAY
          BATON ROUGE, LA 70809

          REPORTED BY:  CLARE SMITH-NEELY, CCR

6022 WESTRIDGE DRIVE
BATON ROUGE, LOUISIANA 70817
(225) 751-8111

# I   N   D   E   X

| ATTORNEY: | WITNESS: | EXAMINATION: | PAGE: |
|-----------|----------|--------------|-------|
| BY MR. FLOWERS | RUSTY JENKINS | DIRECT | 14 |
| BY MR. DIGIULIO | RUSTY JENKINS | CROSS | 33 |
| BY MR. FLOWERS | RUSTY JENKINS | REDIRECT | 45 |
| BY MR. FLOWERS | LUKE COWART | DIRECT | 54 |
| BY MR. DIGIULIO | LUKE COWART | CROSS | 78 |
| BY MR. FLOWERS | BRAD BICKHAM | DIRECT | 87 |
| BY MR. DIGIULIO | BRAD BICKHAM | CROSS | 94 |

USA VS. JESSE A. BURCHAM, SUPPRESSION HEARING, 8-8-16    3

1          THE COURT: GOOD MORNING, EVERYONE.

2               BE SEATED.

3          MR. FLOWERS: GOOD MORNING, YOUR HONOR.

4          MR. DIGIULIO: GOOD MORNING.

5          THE COURT: OKAY.  LET'S CALL THE CASE.

6          THE CLERK: CRIMINAL NUMBER 15-173-BAJ.

7               UNITED STATES OF AMERICA VERSUS JESSE

8          ALLAN BURCHAM.

9          MR. FLOWERS: GOOD MORNING, YOUR HONOR.

10              JAMIE FLOWERS ON BEHALF OF THE UNITED

11         STATES.

12         THE COURT: MR. FLOWERS.

13         MR. DIGIULIO: GOOD MORNING, YOUR HONOR.

14              JOHN DIGIULIO REPRESENTING JESSE

15         BURCHAM, WHO IS PRESENT IN COURT.

16         THE COURT: OKAY.  AND WHO IS JOINING YOU,

17              MR. DIGIULIO.

18         MR. DIGIULIO: OH, THAT'S A LAW CLERK,

19              A STUDENT, JESSICA BROWN.

20         THE COURT: OKAY.  MS. BROWN, WELCOME.

21         MS. BROWN: THANK YOU.

22         THE COURT: YOU'RE LEARNING AT THE FOOT

23              OF THE MASTER HERE, MR. DIGIULIO.

24              ALL RIGHT.  THIS MATTER IS BEFORE THE

25         COURT ON TWO MOTIONS FILED BY THE DEFENDANT:

1      THE FIRST IS THE MOTION TO SUPPRESS EVIDENCE.

2      AND, ALSO, DOCUMENT 28 IS A MOTION TO COMPEL

3      DISCOVERY.

4          WHAT I'D LIKE TO DO IS JUST TAKE THESE

5      MATTERS OUT OF ORDER.  AND LET'S TAKE UP THE

6      MOTION TO COMPEL DISCOVERY FIRST, MR.

7      DIGIULIO.

8      MR. DIGIULIO: YES, SIR.

9      THE COURT: LET ME GIVE YOU AN OPPORTUNITY TO

10         INFORM ME WHICH OR WHAT EVIDENCE YOU

11     BELIEVE IS OUT THERE BUT YOU HAVE NOT

12     RECEIVED.

13     MR. DIGIULIO: WELL, YOUR HONOR, WHAT I'VE

14         TRIED TO DO IS ASK THE GOVERNMENT TO

15     GIVE ME ANYTHING, AND I'VE TRIED TO USE

16     EXPANSIVE LANGUAGE, LOGS, PHONE CALLS,

17     ANYTHING THAT WOULD ESTABLISH THE TIME LINE

18     OF THIS STOP AND THIS SEARCH AND THE

19     DETAINING OF THE DEFENDANT.  MR. FLOWERS HAS

20     INDICATED HE DOESN'T HAVE THAT INFORMATION.

21       SO, WHAT I'VE DONE IS WE'VE SUBPOENAED THE

22     OFFICERS THAT MADE THE STOP, A SUBPOENA DUCES

23     TECUM, FOR THAT SAME INFORMATION.  AND I HAVE

24     COPIES OF THE SUBPOENAS, AS WELL AS THE

25     RETURN.  ACTUALLY, IT WAS JESSICA THAT MADE

1    THE SERVICE.

2          THE LANGUAGE IN THE -- IN THE SUBPOENA

3    BASICALLY TRACKS THE LANGUAGE IN THE

4    DISCOVERY REQUEST.  AND IT SAYS, "ALL

5    COMMUNICATIONS BY YOU AND OTHER OFFICERS WITH

6    YOUR AGENCY AND/OR DEA AND OTHER LAW

7    ENFORCEMENT AGENCIES, INCLUDING BUT NOT

8    LIMITED TO VOICE CALLS, TEXT MESSAGES, E-

9    MAILS, LOGS, PHONE RECORDS, AS WELL AS ANY

10   DATA CONCERNING TIMING AND LOCATIONS OF STOP

11   AND ARREST, PERSONAL TEXTS, E-MAILS AND ANY

12   RECORDINGS FROM OFFICERS' PERSONAL DASH

13   CAMS."  THAT WAS -- THAT WAS -- I'D LIKE TO

14   OFFER AS "DEFENSE EXHIBIT 1."  THAT'S ON

15   OFFICER RUSTY JENKINS.

16   THE COURT: MR. FLOWERS, HAVE YOU RECEIVED

17          A COPY OF THE SUBPOENA?

18   MR. FLOWERS: I HAVE NOT, YOUR HONOR.

19   THE COURT: WELL, LET'S LET HIM TAKE A LOOK

20          AT IT.

21   MR. DIGIULIO: AND WE HAVE THE SAME SUBPOENA,

22          BASICALLY, TO CORPORAL CODY DAVID.  I

23   THINK THE LANGUAGE IS IDENTICAL.  AND THIS

24   ONE IS ACTUALLY MARKED AS "EXHIBIT 8."

25   THEY'RE SOME -- A LITTLE BIT OUT OF ORDER.

1           AND WE HAVE THE SAME SUBPOENA ISSUED TO

2       OFFICER LUKE COWART, AND THE LANGUAGE IS THE

3       SAME.

4       THE COURT: OKAY.

5       MR. DIGIULIO: WE ALSO -- THIS IS -- AND IN

6           ADDITION TO THAT WE SERVED SUPPLEMENTAL

7       SUBPOENAS, ACTUALLY, ON FRIDAY FOR TRAFFIC

8       TICKETS ISSUED BY OFFICERS COWART AND

9       JENKINS, BASICALLY WITHIN A 30-DAY PERIOD

10      BEFORE AND A 30-DAY PERIOD AFTER THE DATE OF

11      THIS STOP.

12      THE COURT: AND, SPECIFICALLY, WHAT

13          INFORMATION ARE YOU SEEKING?

14      MR. DIGIULIO: YOUR HONOR, WELL, ANY OF THE

15          INFORMATION IN THE -- THAT'S LISTED IN

16      THE SUBPOENAS THAT -- OF COURSE, YOU KNOW,

17      OUR POSITION, FRANKLY, IS THAT UNDER KYLES

18      VERSUS WHITLEY, THE GOVERNMENT SHOULD HAVE

19      GOTTEN THAT FOR US.  BUT I WAS INFORMED THEY

20      DIDN'T HAVE IT.  AND, SO, THAT'S THE PURPOSE

21      OF THE SUBPOENA.

22      THE COURT: SO, WHAT DO YOU THINK -- SO, LET

23          ME JUST BE CLEAR.  YOU'RE ONLY SEEKING

24      COMMUNICATIONS AND EVIDENCE OF COMMUNICATION

25      WITH RESPECT TO THIS CASE AND, MORE

1           SPECIFICALLY, THIS DEFENDANT, CORRECT?

2           MR. DIGIULIO: THAT'S RIGHT.  AND THE -- THE

3              TRAFFIC TICKET, WE ACTUALLY MADE A

4           PUBLIC-RECORDS REQUEST FOR THE TRAFFIC

5           TICKETS BEFORE AND AFTER -- 30 DAYS BEFORE

6           AND 30 DAYS AFTER.  AND THE PURPOSE OF THAT

7           -- AND THIS MAY NOT EVEN BE IN CONTENTION, IS

8           TO SHOW THAT THESE OFFICERS ARE NOT REALLY

9           TRAFFIC ENFORCERS.  THEY'RE PART OF THE

10          INTERDICTION TASK FORCE THAT'S TRYING TO PULL

11          PEOPLE OVER AND, FRANKLY, LOOK FOR REASONABLE

12          SUSPICION, PROBABLE CAUSE, TO SEARCH.  AND,

13          SO, WE THINK THE TRAFFIC TICKETS -- AND,

14          ACTUALLY, IN THE PUBLIC-RECORDS REQUEST WE

15          CITED A CASE TO THE -- IN FACT, I WILL --

16          I'LL SUBMIT THAT AS "EXHIBIT 4."

17              JAMIE, I DON'T KNOW IF I HAVE A COPY OF

18          THAT.  BUT LET ME CHECK.

19              BASICALLY, THE PUBLIC-RECORDS REQUEST

20          WAS PRETTY MUCH IGNORED WITH A LETTER SAYING

21          THAT THEY DIDN'T HAVE A LIST OF THOSE

22          TICKETS.  WE RESPONDED WITH CORRESPONDENCE

23          SAYING WE DIDN'T ASK FOR A LIST.  WE ASKED

24          FOR COPIES.  THERE'S A LOUISIANA SUPREME

25          COURT CASE, AND IT'S NOT REALLY YOUR PROBLEM,

1          I SUPPOSE, SINCE THAT'S A SAME PUBLIC-RECORDS

2          REQUEST.  BUT IT JUST SHOWS THE BACKGROUND

3          AND THE REASON THAT WE ISSUED THE

4          SUPPLEMENTAL SUBPOENAS FOR THOSE RECORDS IN

5          THAT CASE.  WE NOTICED THE CITATION IN THAT

6          CASE, BUT IT WAS ACTUALLY MY PUBLIC-RECORDS

7          REQUEST FROM MANY YEARS THAT THE LOUISIANA

8          SUPREME COURT UPHELD.  JUST IN ORDER TO SHOW

9          THE PATTERN OF -- OF THESE OFFICERS THAT MAKE

10         THESE STOPS.

11              NOW, THE ---

12         THE COURT: AND, AGAIN, SO I GUESS THE

13              QUESTION BECOMES: HOW IS THAT RELEVANT?

14         MR. DIGIULIO: WELL, IT'S RELEVANT IN THAT

15              IF THE -- IF THE GOVERNMENT IS WILLING

16         TO ESTABLISH, AND MAYBE THEY WILL, AND AFTER

17         WATCHING SOME TESTIMONY LAST WEEK, IT SEEMS

18         THAT THEY AGREE THAT THERE IS SUCH A THING AS

19         AN INTERDICTION GROUP OR -- THAT -- WHOSE

20         PURPOSE IS TO TRY TO FIND CONTRABAND ON THE

21         HIGHWAYS.  AND THAT'S REALLY WHAT I'M -- IT

22         USED TO BE, FRANKLY, THAT OFFICERS WOULD SAY,

23         "OH, NO, I'M JUST A TRAFFIC -- AND JUST

24         HAPPENED TO STUMBLE INTO THIS OTHER STUFF."

25         IT MAY BE THAT THEY DON'T TAKE THAT POSITION

1          ANY MORE, IN WHICH CASE THE TRAFFIC TICKET

2          SUBPOENA MAY NOT BE NECESSARY.  BUT I THINK

3          THE POINT IS STILL RELEVANT.

4              THE LOGS AND THE OTHER INFORMATION THAT

5          ARE TRYING TO ESTABLISH THE TIMING IS

6          IMPORTANT UNDER THE RODRIGUEZ CASE, WHERE

7          WHEN, BASICALLY, SAYS IF YOU MAKE A TRAFFIC

8          STOP, YOU -- THE COURT, THE SUPREME COURT,

9          HAS SAID YOU CAN -- YOU SHOULD DO THE

10         ORDINARY THINGS.  YOU CHECK TO SEE IF THERE

11         ARE WARRANTS.  YOU SEE IF THE INSURANCE AND

12         REGISTRATION ARE IN ORDER.  YOU ONLY HAVE A

13         VERY LIMITED AMOUNT OF TIME TO DO THAT, AND

14         YOU DON'T DETAIN LONGER THAN THAT.  WELL, IN

15         THIS CASE, NOT ONLY DID THEY DETAIN LONGER

16         THAN THAT, THEY ACTUALLY ARRESTED AND

17         HANDCUFFED MR. BURCHAM BEFORE FINDING ANY

18         CONTRABAND.  AND, WHICH IS A NEW ONE IN MY

19         BOOK.  BUT, ANYWAY, SO, THAT'S WHY I THINK

20         THE -- THE INFORMATION THAT COULD ESTABLISH

21         THE TIME LINE IS IMPORTANT UNDER THE

22         RODRIGUEZ CASE.

23             NOW, I DON'T KNOW IF THE OFFICERS HAVE

24         APPEARED.  BUT THE SUBPOENAS WERE ISSUED

25         BEFORE THAT LAST HEARING YOUR HONOR CONTINUED

1            AND KEPT THEM ACTIVE FOR THIS -- FOR THIS

2            HEARING.  AND THEN IN ADDITION WE ---

3            THE COURT: AND, SO, THERE HAS BEEN NO

4                 COMPLIANCE WITH THE SUBPOENA?

5            MR. DIGIULIO: NO, NO.  I SUBPOENAED THEM

6                 FOR THIS MORNING, 9:30.  SO, JUST -- I

7            GUESS WE NEED TO CHECK FIRST TO SEE WHETHER

8            THEY HAVE RESPONDED TO THOSE SUBPOENAS.

9            THE COURT: OKAY.

10           MR. DIGIULIO: AND THEN UNLESS YOUR HONOR

11                DECIDES IT'S IRRELEVANT.  BUT I THINK

12           UNDER RODRIGUEZ, THE TIMING IS IMPORTANT.

13           THE COURT: WELL, LET ME HEAR FROM MR.

14                FLOWERS.

15           MR. FLOWERS: THANK YOU, YOUR HONOR.  FIRST

16                I'LL START WITH THE LOGS AND THE

17           ELECTRONIC COMMUNICATIONS AND TEXT MESSAGES,

18           E-MAILS AND THE LIST OF THINGS THAT MR.

19           DIGIULIO HAS ASKED FOR.

20                MY UNDERSTANDING IS THAT THESE THINGS

21           SIMPLY DON'T EXIST.  AND THE OFFICERS, I'M

22           SURE, WILL TESTIFY TO THAT TODAY.  THEY USE

23           DEPARTMENT ISSUE RADIOS TO COMMUNICATE WITH

24           EACH OTHER, AND THAT'S NOT RECORDED AND

25           THERE'S NO LOG OF THAT INFORMATION.  SO,

USA VS. JESSE A. BURCHAM, SUPPRESSION HEARING, 8-8-16   11

1           THESE THINGS THAT HAVE BEEN REQUESTED SIMPLY

2           DON'T EXIST IN THIS CASE.  IT'S NOT THAT

3           THEY'RE BEING WITHHELD.

4      THE COURT: BUT AS I UNDERSTAND IT, MR.

5           DIGIULIO IS SEEKING MORE THAN JUST

6           OFFICER LOGS, TO THE EXTENT THEY EXIST, BUT

7           ANY OTHER COMMUNICATION, INCLUDING CELL PHONE

8           OR, EVIDENCE THAT MAY BE ON CELL PHONES OR

9           ANY OTHER COMMUNICATIONS DEVICES OF THE TIME

10          OF THE STOP AND THE TIME THAT ELAPSED, I

11          GUESS, BETWEEN THE INITIAL STOP AND THE

12          DEFENDANT'S EVENTUAL ARREST.

13     MR. FLOWERS: RIGHT.

14     THE COURT: ARE YOU AWARE OF ANY DEVICES,

15          COMMUNICATION DEVICES OR OTHERWISE, THAT

16          MIGHT MEMORIALIZE THAT KIND OF INFORMATION?

17     MR. FLOWERS: I AM NOT, YOUR HONOR.  I ASKED

18          THEM, YOU KNOW, HOW DO YOU ALL

19          COMMUNICATE WITH EACH OTHER DURING THESE

20          STOPS AND HOW DID YOU COMMUNICATE WITH EACH

21          OTHER DURING THIS PARTICULAR STOP.  AND THEY

22          TOLD ME, WE ONLY USE THE DEPARTMENT-ISSUED

23          RADIOS.  WE DON'T USE ANY PERSONAL CELL

24          PHONES TO TEXT EACH OTHER OR TO SEND E-MAILS

25          OR ANY OTHER MEANS OTHER THAN THE DEPARTMENT-

1       ISSUED RADIO.

2           THE COURT: OKAY.  SO, WHAT WE'LL HAVE TO

3               DO HERE, MR. FLOWERS AND MR. DIGIULIO,

4           IF THAT'S IN FACT THE CASE, I WILL ALLOW SOME

5           TESTIMONY ON THAT FROM THE WITNESSES AND

6           WE'LL PROCEED FROM THERE.

7           MR. FLOWERS: OKAY.  SECONDLY, THE MATTER

8               OF THE TRAFFIC TICKETS 30 DAYS BEFORE

9           AND THE 30 DAYS AFTER.  IN ADDITION TO MR.

10          DIGIULIO ASKING FOR THIS INFORMATION FROM THE

11          DEPARTMENT, I ASKED MYSELF WHEN WE RECEIVED

12          THAT REQUEST.  AND THEY TOLD ME THE SAME

13          THING, "WE DON'T KEEP A LIST OF THESE

14          THINGS."  SO, THEY WOULD HAVE TO GO AND, I

15          GUESS, SEARCH THROUGH ALL OF THE TICKETS THAT

16          EVERY OFFICER ISSUED THE 30 DAYS BEFORE AND

17          30 DAYS AFTER.  AND, FRANKLY, IT'S -- IT'S

18          NOT NECESSARY IN THIS CASE FOR THE REASON

19          THAT MR. DIGIULIO WAS STATING, BECAUSE THE

20          OFFICERS WILL TESTIFY.  THEY ARE ON THE HIDTA

21          TEAM; IT'S AN INTERDICTION TEAM, AND THEIR

22          PURPOSE IS TO GO OUT AND INTERDICT WHATEVER

23          CRIME.  THEY'RE NOT NECESSARILY TRAFFIC

24          ENFORCERS.  AND I SUSPECT THAT THEY WILL

25          TESTIFY -- EACH OF THEM WILL TESTIFY TO THAT

1        UNDER OATH TODAY.  SO, THEY DON'T NEED, YOU

2        KNOW, A 60-DAY SPAN OF TICKETS TO ESTABLISH

3        THAT.

4        THE COURT: OKAY.  WELL, LET'S SEE WHAT THEY

5             SAY.  AND THAT MAY SATISFY MR.

6        DIGIULIO'S INQUIRY.  BUT WE'LL TAKE THAT UP A

7        LITTLE BIT LATER, AS WELL.

8        MR. FLOWERS: OKAY.  AND, LASTLY, I'M LOOKING

9             AT -- AND I'M NOT SURE IF THIS IS A TYPO

10       OR WHAT.  BUT ONE OF THESE SUBPOENAS SAYS,

11       "CORPORAL CODY DAVID."  AND I'M NOT SURE WHAT

12       HIS INVOLVEMENT IS IN THIS CASE.  I DON'T SEE

13       HIM LISTED HERE.

14       THE COURT: OKAY.  WELL, LET'S DO THIS THEN.

15             LET'S PROCEED WITH SOME TESTIMONY.  AND

16       WE'LL DETERMINE WHAT OFFICERS WERE OUT THERE.

17       AND IF OFFICER DAVID WAS THERE OR NOT THERE,

18       THAT WILL SATISFY THE INQUIRY.  IF HE WAS

19       THERE, I GUESS MR. DIGIULIO MAY HAVE SOME

20       ADDITIONAL REQUESTS.  BUT LET'S JUST SEE HOW

21       IT GOES.

22       MR. FLOWERS: OKAY.  THANK YOU, YOUR HONOR.

23       THE COURT: ALL RIGHT.  WELL, MR. FLOWERS,

24             AS YOU KNOW, IT IS THE BURDEN OF THE

25       UNITED STATES TO PROVE THAT IT WAS A LAWFUL

1        STOP.  HOW WOULD YOU LIKE TO PROCEED?

2        MR. FLOWERS: YOUR HONOR, THE GOVERNMENT

3            WOULD LIKE TO CALL OUR FIRST WITNESS,

4        OFFICER RUSTY JENKINS.

5        THE COURT: OKAY.

6        THE CLERK: RAISE YOUR RIGHT HAND.

7  THE WITNESS, RUSTY JENKINS, AFTER HAVING FIRST BEEN

8  DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND

9  NOTHING BUT THE TRUTH, TESTIFIED AS FOLLOWS:

10       THE CLERK: STATE AND SPELL YOUR NAME

11           FOR THE RECORD.

12       THE WITNESS: IT'S RUSTY JENKINS,

13           R-U-S-T-Y  J-E-N-K-I-N-S.

14               DIRECT EXAMINATION

15  MR. FLOWERS:

16  Q.   MR. JENKINS, ARE YOU CURRENTLY EMPLOYED?

17  A.   YES.

18  Q.   AND WHO ARE YOU EMPLOYED BY?

19  A.   BATON ROUGE POLICE DEPARTMENT.

20  Q.   AND HOW LONG HAVE YOU BEEN WITH THE BATON ROUGE

21       POLICE DEPARTMENT?

22  A.   A LITTLE OVER FOUR YEARS.

23  Q.   WHAT DO YOU DO WITH THE BATON ROUGE POLICE

24       DEPARTMENT?

25  A.   I'M ASSIGNED TO THE NARCOTICS DIVISION, HIDTA

1        TASK FORCE.

2   Q.   AND WHAT IS THE HIDTA TASK FORCE?

3   A.   IT'S A TASK FORCE THROUGH THE DEA THAT CONSISTS

4        OF, IN OUR GROUP, INTERDICTION OFFICERS .

5   Q.   OKAY.  AND HIDTA, WHAT DOES THAT STAND FOR?

6   A.   HIGH INTENSITY DRUG TRAFFICKING AREA.

7   Q.   HIGH INTENSITY DRUG TRAFFICKING AREA?

8   A.   CORRECT.

9   Q.   OKAY.  AND WHAT IS THE MISSION OF THAT TASK

10       FORCE?

11  A.   TO INTERSECT ANY SORT OF CRIMINAL ACTIVITY THAT

12       UTILIZES THE INTERSTATES OF THE UNITED STATES.

13  Q.   OKAY.  CRIMINAL ACTIVITIES SUCH AS WHAT?

14  A.   DRUG SMUGGLING, PEOPLE SMUGGLING, WEAPONS

15       SMUGGLING, ANY SORT OF CRIMINAL ACT -- LARGE

16       AMOUNT OF CRIMINAL ACTIVITIES THAT WOULD UTILIZE

17       THE INTERSTATE TO COMMERCE IT.

18  Q.   AND HOW LONG HAVE YOU BEEN ON THAT TASK FORCE?

19  A.   A LITTLE OVER TWO YEARS.

20  Q.   AND DO YOU HAVE TO RECEIVE ANY KIND OF

21       SPECIALIZED TRAINING OR ANYTHING OF THAT NATURE

22       TO WORK ON THAT TASK FORCE?

23  A.   NOT TO INITIALLY GET IN, BUT WE DO RECEIVE

24       TRAINING THROUGHOUT OUR TENURE IN IT.

25  Q.   OKAY.  WHAT TYPE OF TRAINING?

USA VS. JESSE A. BURCHAM, SUPPRESSION HEARING, 8-8-16  16

1  A.  ANYWHERE FROM DECEPTION TRAINING TO COMPARTMENT

2      DRUG -- LOCATING COMPARTMENTS IN VEHICLES, DRUG

3      RECOGNITION, THINGS OF THAT NATURE.

4  Q.  OKAY.  LOCATING COMPARTMENTS IN VEHICLES, TELL US

5      A LITTLE BIT ABOUT THAT.  WHAT TRAINING?

6  A.  TRAINING YOU WOULD -- TRAINING OF IT IS, IT

7      TEACHES YOU WHAT'S NORMAL AND STOCK MANUFACTURERS

8      AS FAR AS THE WAY METAL IS CURVED, NATURAL VOIDS,

9      HOW TO LOCATE THE NATURAL VOIDS IN THE -- ON THE

10     VEHICLES AND HOW THEY'RE USED TO STORE OR EITHER

11     TRANSPORT OR HIDE, CONCEAL ANY TYPE OF OBJECT,

12     WHETHER IT BE NARCOTICS, GUNS, MONEY OR ANYTHING.

13 Q.  AND WHEN DID YOU COMPLETE THAT TRAINING?

14 A.  I'M NOT EXACTLY SURE ON THE DATES.  I'VE BEEN

15     THROUGH SEVERAL OTHER COURSES THROUGHOUT MY FULL

16     CAREER.

17 Q.  OKAY.  NOW, GOING BACK TO THE INTERDICTION TASK

18     FORCE.  SO, HOW DOES THIS WORK WHEN YOU'RE OUT

19     THERE WORKING THIS MISSION?

20 A.  OUR BASIC -- OUR MAIN -- OUR MAIN OBJECTIVE IS

21     JUST TRAFFIC. YOU KNOW, WE'RE OUT THERE TO

22     ENFORCE TRAFFIC LAWS.  AND WITH OUR TRAINING WE

23     -- WE LEARN HOW TO DO ROADSIDE INTERVIEWS AND SEE

24     IF THERE'S ANYTHING ELSE GOING ON WITH THIS

25     PERSON OR THE VEHICLE.  AND THEN WE JUST, YOU

Case 3:15-cr-00173-BAJ-EWD   Document 44   08/22/16   Page 17 of 102

1      KNOW, BASED UPON -- UTILIZE THAT INFORMATION TO

2      JUST DO IT AS A REGULAR TRAFFIC STOP OR TO GO

3      FURTHER.

4   Q.  OKAY.  SO, DID YOU SAY YOUR MAIN MISSION IS TO

5      ENFORCE TRAFFIC?

6   A.  CORRECT.

7   Q.  OKAY.  SO, WHERE DOES THE INTERDICTION PART OF

8      THAT COME IN?

9   A.  WELL, IT'S WHENEVER WE -- WHENEVER WE DO OUR

10     ROADSIDE INTERVIEWS, YOU KNOW, IF WE FEEL THAT

11     THIS PERSON IS MAYBE TIED TO SOME SORT OF

12     CRIMINAL ACTIVITY, THEN WE GO FURTHER INTO THE

13     INTERDICTION PART OF IT.

14  Q.  OKAY.  I WANT TO DIRECT YOUR ATTENTION TO AN

15     INCIDENT THAT OCCURRED ON MAY 3RD, 2015, THAT

16     INVOLVED AN INDIVIDUAL NAMED JESSE BURCHAM.  DO

17     YOU RECALL THAT INCIDENT?

18  A.  YES, I DO.

19  Q.  OKAY.  TELL US HOW YOU GOT INVOLVED WITH THAT

20     PARTICULAR INCIDENT.

21  A.  I WAS TRAVELING EAST ON I-12, AND I OBSERVED A

22     VEHICLE THAT APPEARED TO BE GOING FASTER THAN THE

23     POSTED SPEED LIMIT OF 60.  I THEN STARTED PACING

24     THE VEHICLE AND CONFIRMED THAT THE VEHICLE WAS

25     SPEEDING, DOING 69 MILES AN HOUR IN A 60 POSTED

```
 1          ZONE.
 2   Q.   DID YOU NOTICE ANYTHING ELSE OUT OF THE ORDINARY
 3          ABOUT THE VEHICLE?
 4   A.   I NOTICED THAT THE -- THAT THE REAR TAIL LIGHTS
 5          APPEARED TO BE BRIGHTER THAN A NORMAL RUNNING
 6          LIGHT, AS IF THEY BRAKE WAS BEING CONSTANTLY
 7          APPLIED.  I NOTICED THAT ABOUT THE VEHICLE.  AND
 8          THEN I ALSO PACED THE VEHICLE.  I OBSERVED IT
 9          DRIFTING BACK AND FORTH INSIDE OF ITS LANE.
10   Q.   OKAY.  SO, ONCE YOU OBSERVED ALL OF THOSE THINGS,
11          WHAT IF ANYTHING DID YOU DO NEXT?
12   A.   I THEN CONDUCTED -- ACTIVATED MY LIGHTS AND
13          CONDUCTED A TRAFFIC STOP.
14   Q.   OKAY.  NOW, WERE YOU TRAVELING BY YOURSELF AT
15          THIS TIME OR DID YOU HAVE A PARTNER IN THE CAR
16          WITH YOU?
17   A.   NO.  I WAS BY MYSELF.
18   Q.   OKAY.  NOW, THE TASK FORCE THAT YOU'RE A PART OF,
19          DO YOU ALL WORK IN TEAMS OR ARE YOU JUST OUT
20          THERE BY YOURSELF?
21   A.   NO.  WE HAVE -- WE HAVE A TEAM THAT'S EMPLOYED BY
22          THE BATON ROUGE POLICE DEPARTMENT.  THERE'S FOUR
23          OF US THAT WERE OUT THERE.
24   Q.   OKAY.  AND WHAT FOUR OF YOU WERE OUT THERE?
25   A.   THERE'S ME, CORPORAL LUKE COWART, CORPORAL CODY
```

1      DAVID, AND OFFICER BRAD BICKHAM.

2  Q.  OKAY.  ALL RIGHT.  WE'LL GET TO THAT IN A SECOND.

3         SO, YOU CONDUCTED A TRAFFIC STOP ON THAT

4      VEHICLE THAT YOU JUST MENTIONED; IS THAT RIGHT?

5  A.  CORRECT.

6  Q.  OKAY.  AND DID YOU MAKE CONTACT WITH THE DRIVER?

7  A.  YES, I DID.

8  Q.  AND WHO WAS OPERATING THE VEHICLE?

9  A.  MR. JESSE BURCHAM.

10 Q.  OKAY.  WHY DID YOU DO ONCE YOU MADE CONTACT WITH

11     MR. BURCHAM?

12 A.  I MADE CONTACT WITH HIM.  I IDENTIFIED MYSELF.  I

13     EXPLAINED TO HIM THE REASON FOR THE STOP.  WE

14     WERE ACTUALLY -- I HAD GOTTEN HIM OUT OF THE

15     VEHICLE.  I EXPLAINED TO HIM THE REASON FOR THE

16     STOP AND WE ADDRESSED THE ISSUE OF THE TAIL

17     LIGHTS BEING TOO BRIGHT.

18 Q.  OKAY.  SO, WHEN YOU SAY YOU "GOT HIM OUT OF THE

19     VEHICLE," WHAT DO YOU MEAN?

20 A.  I ASKED HIM TO STEP OUT OF THE VEHICLE.

21 Q.  OKAY.  AND WHERE WERE YOU LOCATED?

22 A.  STANDING RIGHT DIRECTLY BEHIND HIS.

23 Q.  OKAY.  SO, YOU APPROACHED HIS VEHICLE AND YOU

24     IMMEDIATELY ASKED HIM TO GET OUT OF THE VEHICLE?

25 A.  YES.  I ASKED HIM TO STEP OUT WITH HIS DRIVER'S

1    LICENSE AND THE INSURANCE AND REGISTRATION.

2 Q.  OKAY.  AND WHY DID YOU DO THAT?

3 A.  TO IDENTIFY HIM AND ALSO TO SEE -- MAKE SURE HE'S

4    THE OWNER OF THE VEHICLE.

5 Q.  OKAY.  WHY DID YOU ASK HIM TO STEP OUT OF THE

6    VEHICLE?

7 A.  IT'S FOR OFFICER SAFETY.  WE ALSO ASK THEM TO

8    STEP OUT.

9 Q.  OKAY.  SO, ONCE YOU GET HIM OUT OF THE VEHICLE

10    AND YOU SAID HE'S BEHIND HIS VEHICLE?

11 A.  YES.

12 Q.  OKAY.  AND WHAT DID YOU DO NEXT?

13 A.  WE ADDRESSED THE ISSUE WITH THE LIGHTS.  HE SAID

14    THAT'S THE WAY IT CAME FROM THE FACTORY.  I THEN

15    ADDRESSED THE ISSUE OF HIM SPEEDING, IN WHICH HE

16    -- HE APOLOGIZED FOR IT.  HE ADVISED HE DIDN'T

17    REALIZE HE WAS GOING THAT FAST.

18 Q.  OKAY.  THEN WHAT HAPPENED?

19 A.  THEN I ASKED HIM -- REFERRING BACK TO THE -- HIS

20    DRIFTING BACK AND FORTH.  I WANTED TO MAKE SURE

21    HE WASN'T FATIGUED IN ANY WAY, DRIVING A LONG

22    DISTANCE.  SO, I ASKED HIM WHERE HE WAS COMING

23    FROM.

24 Q.  OKAY.  AND HOW DID HE RESPOND?

25 A.  HE RESPONDED BY SAYING, "NEAR COLORADO."

1   Q.   OKAY.  AND DID THAT STAND OUT TO YOU?

2   A.   YES, IT DID.

3   Q.   WHY IS THAT?

4   A.   BECAUSE MOST PEOPLE THAT I ASK THAT, THEY MAY

5        GIVE A BIG CITY.  THEY MAY SAY, "I'M COMING FROM

6        NEAR BATON ROUGE OR COMING FROM NEAR HOUSTON,"

7        BUT NEVER NEAR A WHOLE STATE.

8   Q.   OKAY.  AND WHAT ELSE HAPPENED?

9   A.   AND THEN I TALKED TO HIM ABOUT HIS TRAVEL SOME

10       MORE.  I ASKED HIM HOW LONG HE HAD BEEN GONE. HE

11       SAID HE HAD BEEN GONE FOR A WEEK FOR WORK.  I

12       ASKED HIM WHAT KIND OF WORK.  HE ADVISED PRIVATE

13       SECURITY.  I THOUGHT MAYBE HE HAD DONE -- THAT HE

14       WAS DOING SOME TYPE OF PRIVATE SECURITY, CONTRACT

15       WORK OVERSEAS.  I ASKED HIM SPECIFICALLY WHAT

16       TYPE HE WAS DOING, AND HE SAID THAT HE WAS DOING

17       PERSONAL PROTECTION, BODYGUARD-TYPE WORK.  I THEN

18       ASKED HIM, FOR MY SAFETY, IF HE HAD ANY WEAPONS

19       ON HIM, AND HE ADVISED NO.

20  Q.   OKAY.  WHAT, IF ANYTHING ELSE, DID HE SAY?

21  A.   AFTER I ASKED HIM, YOU KNOW, IF HE HAD ANY

22       WEAPONS, HE STATED, "NO."  I FOUND THAT VERY

23       SUSPICIOUS THAT HE WAS DOING THAT TYPE OF

24       SECURITY WORK AND NOT ARMED.

25  Q.   OKAY.  SO, WHAT DID YOU DO NEXT?

1  A.   I THEN -- BECAUSE OF EVERYTHING, I WANTED TO GO

2       AHEAD AND LOOK INTO -- LOOK INTO HIS TRAFFIC STOP

3       FURTHER.  SO, I ADVISED THE GUYS ON MY TEAM THAT

4       I WANTED TO LOOK INTO THE VEHICLE.

5  Q.   OKAY.  AND WHO WAS ON THE TEAM WITH YOU?

6  A.   BRAD BICKHAM, LUKE COWART AND CODY DAVID.

7  Q.   OKAY.  SO, CODY DAVID WAS OUT THERE WITH YOU GUYS

8       THAT DAY?

9  A.   YES.  HE WAS OUT THERE LATER.

10 Q.   LATER, OKAY.  SO, ABOUT HOW MUCH TIME HAD PASSED

11      BETWEEN WHEN YOU FIRST PULLED OVER THE VEHICLE UP

12      UNTIL THAT POINT WHERE YOU DECIDED TO CALL THE

13      OTHER MEMBERS OF YOUR TEAM?

14 A.   APPROXIMATELY TWO MINUTES.

15 Q.   OKAY.  SO, ONCE YOU CALLED THE MEMBERS OF YOUR

16      TEAM OUT, WHAT HAPPENED?

17 A.   OFFICER BRAD BICKHAM PULLS UP.  AND WHILE HE'S --

18      HE ROLLS DOWN HIS WINDOW SO HE CAN HEAR OUR

19      CONVERSATION.  I THEN ASKED MR. BURCHAM FOR

20      CONSENT TO SEARCH THE VEHICLE, WHICH HE GAVE ME

21      PERMISSION TO.  AND THEN OFFICER BICKHAM STEPPED

22      OUT TO STAY AT THE FRONT OF MY PATROL UNIT WITH

23      BURCHAM.

24 Q.   HOW LONG DID IT TAKE FOR OFFICER BICKHAM TO

25      ARRIVE ON THE SCENE ONCE YOU CALLED FOR HIM?

1  A.  A MINUTE OR TWO.  WE'RE ALL -- WE'RE ALL UP ON

2       THE SAME AREA, SO IT DOESN'T TAKE LONG.

3  Q.  OKAY.  AND WHAT WERE YOU DOING WITH MR. BURCHAM

4       WHILE YOU WAITED ON OFFICER BICKHAM TO GET THERE?

5  A.  JUST TALKING TO HIM, GENERAL CONVERSATION.

6  Q.  OKAY.  AND YOU MENTIONED THAT YOU HAD OBTAINED

7       HIS DRIVER'S LICENSE AND OTHER DOCUMENTS RELATED

8       TO HIM OPERATING THE VEHICLE?

9  A.  YES.

10 Q.  DID YOU EVER RUN ANYTHING -- RUN ANY BACKGROUND

11      ON HIM?

12 A.  NO.

13 Q.  OKAY.  AND WHY DIDN'T YOU DO THAT?

14 A.  I -- AT THE TIME I DIDN'T FEEL I NEEDED TO.  IF

15      THE -- IF THERE WAS GOING TO BE ISSUING ANY

16      CITATIONS OR ANYTHING, THEN I WOULD HAVE RAN IT

17      FURTHER TO MAKE SURE.

18 Q.  OKAY.  SO, YOU MENTIONED THAT YOU ASKED HIM FOR

19      CONSENT TO SEARCH HIS VEHICLE?

20 A.  YES.

21 Q.  TELL ME ABOUT THAT CONVERSATION.

22 A.  I JUST SIMPLY ASKED HIM, YOU KNOW, I EXPLAINED TO

23      HIM THAT PART OF OUR JOB ON THE INTERSTATE IS TO

24      INTERCEPT NARCOTICS, WEAPONS, STUFF LIKE THAT. I

25      ASKED HIM IF HE HAD ANYTHING LIKE THAT IN HIS

1 | VEHICLE.  HE SAID, "NO."  I ASKED HIM IF I COULD

2 | SEARCH THE VEHICLE, HE SAID, "GO RIGHT AHEAD."

3 Q. OKAY.  AND YOU SAID BY THAT TIME OFFICER BICKHAM

4 | HAD ARRIVED ON THE SCENE?

5 A. YES, HE WAS ON THE SCENE.

6 Q. OKAY.  SO, ONCE YOU RECEIVED THE CONSENT FROM MR.

7 | BURCHAM, WHAT HAPPENED NEXT?

8 A. OFFICER BICKHAM GETS OUT, STANDS WITH BURCHAM IN

9 | THE FRONT OF MY UNIT, AND I GO AHEAD AND I START

10 | LOOKING INTO THE VEHICLE.

11 Q. OKAY.  AND, SO, AT THIS POINT IT'S JUST YOU AND

12 | OFFICER BICKHAM THERE?

13 A. YES.

14 Q. DO ANY OTHER OFFICERS ARRIVE?

15 A. APPROXIMATELY, TWO TO THREE MINUTES LATER, AFTER

16 | I STARTED SEARCHING IT, CORPORAL COWART SHOWS UP

17 | ON THE SCENE AND HE ASSISTS ME WITH THE SEARCH.

18 Q. OKAY.  NOW, ARE ANY OF THE OFFICERS, EITHER YOU

19 | OR OFFICER BICKHAM OR OFFICER COWART, CANINE

20 | HANDLERS?

21 A. YES.  WE ALL WERE AT THAT TIME.

22 Q. OKAY.  AND DID YOU UTILIZE A CANINE AT ANY POINT

23 | DURING YOUR SEARCH?

24 A. NO.

25 Q. SO, ONCE OFFICER COWART GOT THERE, WHAT HAPPENED?

Case 3:15-cr-00173-BAJ-EWD   Document 44   08/22/16   Page 25 of 102

1  A.   HE STARTED ASSISTING ME WITH THE SEARCH.  HE WAS

2       LOOKING AROUND THE REAR OF THE VEHICLE.  HE THEN

3       CALLED ME AND ASKED ME -- TOLD ME TO COME OVER

4       AND LOOK.  AND HE HAD LOCATED SOME TORX HEAD

5       SCREWS ON THE INNER FENDER WELL ON THE REAR

6       PASSENGER SIDE THAT HAD FRESH TOOL MARKS,

7       INDICATING THAT IT HAD RECENTLY BEEN TAKEN OFF.

8  Q.   OKAY.  SO, WHAT DID YOU GUYS DO NEXT?

9  A.   WE THEN LOOKED AT THE VEHICLE AND NOTICED THAT BY

10      -- IF THEY -- IF SOMEONE WAS ACCESSING THOSE

11      SCREWS, THEY WERE GOING -- THE ONLY THING THEY

12      WERE DOING WAS TAKING THE REAR BUMPER OFF.  SO,

13      THEN WE STARTED LOOKING UNDER THE VEHICLE, AND

14      THAT'S WHENEVER WE NOTICED THE -- A ALUMINUM BOX

15      THAT WAS INCONSISTENT WITH MANUFACTURER'S

16      MATERIAL.

17 Q.   AND WHAT DO YOU MEAN IT WAS INCONSISTENT?

18 A.   THE BOX HAD 90-DEGREE -- 90-DEGREE TURNS ON IT,

19      WHICH IS INCONSISTENT WITH -- WITH MANUFACTURERS.

20      THE MANUFACTURERS ARE ONLY CURVED.  THIS WAS

21      SQUARED OFF 90 DEGREES.  AND IT ALSO JUST -- THE

22      COLOR OF IT DIDN'T MATCH THE UNDER CARRIAGE.

23 Q.   OKAY.  SO, WHAT, IF ANYTHING, WAS GOING THROUGH

24      YOUR MIND WHEN YOU NOTICED THAT?

25 A.   THAT IT WAS A COMPARTMENT USED TO CONCEAL

1          SOMETHING.

2  Q.   OKAY.  SO, WHAT DID YOU DO NEXT?

3  A.   WE THEN -- TO CONFIRM THAT THAT'S WHAT IT WAS, WE

4          OPENED THE TRUNK, LOOKED INSIDE THE TRUNK, AND

5          PULLED THE DRAIN PLUG HOLE.  AND NOTICED THAT

6          THAT SAME METAL WAS BLOCKING THE DRAIN HOLE,

7          WHICH -- WHICH IS -- CAUSED THE DRAIN HOLE TO BE

8          INEFFECTIVE.

9  Q.   OKAY.

10 A.   SO, AT THAT TIME WE KNEW THAT THERE WAS SOME TYPE

11         OF COMPARTMENT THERE.  SO, WE DETAINED MR.

12         BURCHAM.

13 Q.   NOW, IS THAT UNUSUAL FOR SOMETHING TO BLOCK THE

14         DRAIN HOLES?

15 A.   YES.  IF IT'S BLOCKING THE DRAIN HOLES, IT

16         DOESN'T SERVE ITS PURPOSE.

17 Q.   OKAY.  ALL RIGHT.  SO, WHAT DID YOU -- WHAT, IF

18         ANYTHING, DID YOU ALL DO NEXT?

19 A.   THAT'S WHENEVER WE DETAINED MR. BURCHAM.

20 Q.   OKAY.  SO, I WANT TO TALK ABOUT THAT.  SO, YOU

21         SAID AT THAT POINT YOU DETAINED MR. BURCHAM?

22 A.   YES.

23 Q.   NOW, WAS HE FREE TO GO BEFORE THAT POINT?

24 A.   YES.

25 Q.   OKAY.  HAD YOU TOLD HIM HE WAS FREE TO GO?

USA VS. JESSE A. BURCHAM, SUPPRESSION HEARING, 8-8-16   27

1   A.   NO.  HE DIDN'T ASK.

2   Q.   OKAY.

3   A.   HE DIDN'T ASK.  HE DIDN'T ASK US TO STOP THE

4        SEARCH OF THE VEHICLE OR ANYTHING.

5   Q.   SO, AT WHAT POINT AFTER YOU FIRST MADE THE

6        TRAFFIC STOP WAS HE THEN FREE TO GO?

7   A.   I APOLOGIZE.  HE WAS NOT FREE TO GO, BECAUSE I

8        WAS -- HAD NOT CONCLUDED MY TRAFFIC STOP YET.

9   Q.   OKAY.  ALL RIGHT.  SO, OKAY.  SO, I WANT TO GO

10       BACK TO WHAT YOU SAID.

11            YOU SAID AFTER YOU SAW THE COMPARTMENT, YOU

12       THEN DETAINED HIM?

13  A.   YES.

14  Q.   WHAT DO YOU MEAN BY THAT?

15  A.   HE WAS PLACED IN HANDCUFFS AND ADVISED OF HIS

16       RIGHTS PER MIRANDA.

17  Q.   OKAY.  SO, BASED ON YOUR TESTIMONY, YOU SAID HE

18       WASN'T FREE TO GO AT ANY POINT AFTER YOU STOPPED

19       HIM.  WHAT MADE YOU THEN PUT HIM IN HANDCUFFS?

20  A.   BECAUSE OF THE -- BECAUSE OF THE COMPARTMENT

21       BEING LOCATED, WE DETAINED HIM BECAUSE OF THE

22       FACT, ONE, OUR OFFICER SAFETY, TWO, HIS SAFETY.

23       BASICALLY DUE TO THE FACT THAT PRIOR TO THAT THEY

24       HAD -- NOT HIM HIMSELF IN THIS SITUATION.  BUT IN

25       EXPERIENCE, IF THEY HAVE ANYTHING HIDDEN, THEY

1      FEEL AT EASE BECAUSE IT'S HIDDEN; THEY DON'T

2      THINK WE'RE GOING TO FIND IT.  AND ONCE THEY FIND

3      IT, THEY -- THE RISK OF THE SUSPECT EITHER

4      RUNNING, FIGHTING OR EVEN COMMITTING SUICIDE BY

5      RUNNING OUT IN TRAFFIC, HAVE OCCURRED.

6          SO, AS SOON AS WE LOCATED THIS AND TO -- FOR

7      OUR SAFETY AND HIS SAFETY, HE'S IMMEDIATELY

8      DETAINED TO REFRAIN FROM ANY OF THAT HAPPENING.

9  Q.  OKAY.  AND WHEN YOU SAY, "DETAINED," YOU MEAN

10     PLACED IN HANDCUFFS?

11 A.  PLACED IN HANDCUFFS.  CORRECT.

12 Q.  OKAY.  AND YOU READ HIM HIS RIGHTS?

13 A.  YES.

14 Q.  WHY DID YOU DO THAT?

15 A.  BECAUSE HE IS DETAINED AND THEN BECAUSE IF THERE

16     IS A FURTHER INVESTIGATION GOING TO OCCUR WITH

17     HIS VEHICLE, I WANT TO MAKE SURE THAT ANY

18     STATEMENT THAT HE -- THAT HE'S GIVEN THAT HE

19     KNOWS THAT IT CAN BE USED IN COURT.

20 Q.  OKAY.  SO, AFTER YOU PUT HIM IN HANDCUFFS AND

21     READ HIM HIS RIGHTS, WHAT, IF ANYTHING, DID YOU

22     DO NEXT?

23 A.  WHEN I ADVISED HIM OF HIS RIGHTS, HE IMMEDIATELY

24     ASKED FOR AN ATTORNEY, AND HE WAS PLACED IN

25     CORPORAL DAVID'S CAR.

1   Q.   OKAY.  AND THEN WHAT HAPPENED?

2   A.   WE THEN DECIDED IT WAS SAFER FOR EVERYBODY TO

3        FURTHER SEARCH HIS VEHICLE AT OUR OFFICE.  SO, WE

4        THEN TRANSPORTED HIM AND THE VEHICLE TO OUR

5        OFFICE.

6   Q.   OKAY.  YOU JUST MENTIONED THAT HE WAS PLACED IN

7        CORPORAL DAVID'S CAR?

8   A.   YES.

9   Q.   WHEN DID CORPORAL DAVID ARRIVE ON THE SCENE?

10  A.   JUST PRIOR TO US LOCATING THE COMPARTMENT.

11  Q.   OKAY.  AND DID HE TAKE PART IN THE SEARCH AT ALL?

12  A.   I DON'T BELIEVE.

13  Q.   OKAY.  WHAT WAS HE DOING WHILE YOU ALL WERE

14       SITTING -- YOU AND CORPORAL COWART WERE SEARCHING

15       THE VEHICLE?

16  A.   CORRECT.

17  Q.   AND OFFICER BICKHAM --

18  A.   YES.

19  Q.   -- WAS STANDING WITH MR. BURCHAM?

20  A.   CORRECT.

21  Q.   WHAT WAS CORPORAL DAVID DOING?

22  A.   ACTUALLY, I THINK IT WAS RIGHT AS WE WERE

23       LOCATING -- HE WAS JUST ARRIVING. SO, HE WAS

24       WALKING UP TO THE TRAFFIC STOP.

25  Q.   OKAY.  ALL RIGHT.  SO, MR. BURCHAM WAS PLACED IN

**CLARE SMITH-NEELY, CERTIFIED COURT REPORTER (225) 751-8111**

1     THE BACK OF CORPORAL DAVID'S VEHICLE.  THEN WHAT
2     HAPPENED?
3  A.  WE TRANSPORTED HIM AND THE VEHICLE TO OUR OFFICE.
4  Q.  WHY DID YOU DO THAT?
5  A.  FOR SAFETY REASONS.  BECAUSE WE KNEW THAT WE WERE
6     GOING TO HAVE TO TAKE THIS BUMPER OFF.  SO,
7     INSTEAD OF DOING IT ON THE ROADSIDE WITH TRAFFIC
8     PASSING US, WE JUST BROUGHT IT TO OUR OFFICE
9     WHERE IT'S SAFER FOR EVERYBODY.
10 Q.  OKAY.  SO, ONCE YOU -- WHERE DID YOU TAKE THE
11    VEHICLE?
12 A.  TO OUR OFFICE.
13 Q.  AND WHAT OFFICE IS THAT?
14 A.  TO THE DEA OFFICE.
15 Q.  AND WHERE IS THAT LOCATED?
16 A.  IT'S LOCATED ON ACADIAN THRUWAY.
17 Q.  OKAY.  ABOUT HOW LONG DID IT TAKE FOR YOU TO GET
18    THERE?
19 A.  LESS THAN FIVE MINUTES.
20 Q.  HOW DID THE VEHICLE, MR. BURCHAM'S VEHICLE, GET
21    FROM THE SCENE TO THE DEA OFFICE?
22 A.  I THINK IT WAS DRIVEN BY A DEPUTY.
23 Q.  ONE OF THE NAMES THAT YOU JUST MENTIONED OR
24    SOMEBODY ELSE?
25 A.  SOMEONE ELSE.  I DON'T KNOW WHO THAT DEPUTY'S

USA VS. JESSE A. BURCHAM, SUPPRESSION HEARING, 8-8-16   **31**

1      NAME IS.

2  Q.  OKAY.  ALL RIGHT.  SO, WHAT HAPPENED ONCE YOU ALL

3      GOT BACK TO THE DEA OFFICE?

4  A.  ONCE WE GOT BACK TO THE DEA OFFICE, WE THEN

5      STARTED FOCUSING ON THE REAR OF THE VEHICLE,

6      WHERE THE DRAIN -- DRAIN PLUG WAS.  WE UTILIZED A

7      SMALL DRILL BIT AND HE DRILLED THE AFTER-MARKET

8      METAL.  AND ONCE WE DRILLED IT AND PULLED THE BIT

9      OUT, THERE WAS A WHITE POWDERY SUBSTANCE ON IT

10     CONSISTENT WITH POWDER COCAINE.  WE THEN UTILIZED

11     A COCAINE SWAB, WHICH SHOWED AN IMMEDIATE

12     REACTION TO THE PRESENCE OF COCAINE ON IT.

13 Q.  OKAY.  WHAT HAPPENED NEXT?

14 A.  WE THEN REMOVED THE BUMPER FROM THE VEHICLE,

15     WHICH AS SOON AS THE BUMPER CAME OFF IT WAS --

16     IMMEDIATELY GAVE ACCESS TO THE AFTER-MARKET

17     COMPARTMENT.  AND WE NOTICED THAT IT WAS -- THAT

18     IT CONTAINED KILO SIZE OF SUSPECTED COCAINE.

19 Q.  OKAY.  ABOUT HOW MUCH?

20 A.  TWELVE KILOS.

21 Q.  OKAY.  AND WAS IT PACKAGED AT ALL OR HOW WAS IT

22     ---

23 A.  YES.  IT WAS -- IT WAS ALL WRAPPED IN BLACK DUCT

24     TAPE.

25 Q.  OKAY.  WAS IT WRAPPED IN ONE LARGE GROUP OR ---

Case 3:15-cr-00173-BAJ-EWD  Document 44  08/22/16  Page 32 of 102

1  A.  NO, EACH INDIVIDUAL KILOS OF ONE EACH.  IT WAS 12

2     KILO-SIZE PACKAGES.

3  Q.  OKAY.  WHAT, IF ANYTHING, DID YOU ALL DO NEXT?

4  A.  ONCE WE LOCATED THAT, I THEN ADVISED MR. BURCHAM

5     THAT HE WAS UNDER ARREST FOR POSSESSION WITH

6     INTENT TO DISTRIBUTE A SCHEDULE II DRUG.

7  Q.  OKAY.  NOW, I WANT TO -- JUMP OUT OF ORDER AND GO

8     BACK TO SOMETHING IN JUST A SECOND.

9        WHEN YOU ASKED MR. BURCHAM FOR CONSENT, WAS

10     HE IN HANDCUFFS AT THAT POINT?

11  A.  NO.

12  Q.  OKAY.  SO, WHAT WAS HE DOING?

13  A.  STANDING THERE.

14  Q.  OKAY.

15  A.  WE WERE STANDING THERE FACE TO FACE.

16  Q.  OKAY.  NOW, HOW DO YOU ASK FOLKS FOR CONSENT TO

17     SEARCH THEIR VEHICLE?  JUST SOMETHING STANDARD

18     THAT YOU SAY?

19  A.  YES.  I JUST ASKED THEM, "DO YOU HAVE ANY -- ANY

20     TYPE OF NARCOTICS, MARIJUANA, COCAINE,

21     METHAMPHETAMINE?"  I ASK THEM IF THEY HAVE ANY

22     TYPE OF WEAPONS, GUNS, KNIVES, HAND GRENADES,

23     BAZOOKAS.  AND THEN I GO INTO ASKING FOR CONSENT.

24  Q.  OKAY.  AND HOW DO YOU ASK FOR CONSENT?

25  A.  I JUST ASK THEM, YOU KNOW, "DO YOU MIND IF I

Case 3:15-cr-00173-BAJ-EWD Document 44 08/22/16 Page 33 of 102

1     SEARCH YOUR VEHICLE?"

2  Q.   OKAY.  AND THAT'S WHAT YOU SAID TO MR. BURCHAM?

3  A.   YES.

4  Q.   OKAY.  AND DID HE SEEM TO UNDERSTAND YOU?

5  A.   YES.

6  Q.   WAS THERE ANY KIND OF LANGUAGE BARRIER OR

7       ANYTHING LIKE THAT?

8  A.   NO.

9  Q.   OKAY.

10          MR. FLOWERS:  THOSE ARE ALL THE QUESTIONS I

11              HAVE AT THIS TIME, YOUR HONOR.

12          THE COURT: OKAY.  THANK YOU, MR. FLOWERS.

13              MR. DIGIULIO?

14                  CROSS EXAMINATION

15  MR. DIGIULIO:

16  Q.   GOOD MORNING, OFFICER JENKINS.

17  A.   GOOD MORNING.

18  Q.   I'M JOHN DIGIULIO, REPRESENTING MR. BURCHAM.

19          YOU INDICATED THAT YOUR PRIMARY PURPOSE IS

20       TRAFFIC ENFORCEMENT?

21  A.   CORRECT.

22  Q.   DID THE -- DID YOUR OFFICE, POLICE DEPARTMENT,

23       SHOW YOU THE PUBLIC RECORDS REQUEST THAT WE MADE

24       FOR TRAFFIC TICKETS ISSUED BY YOU 30 DAYS BEFORE

25       AND 30 DAYS -- NOBODY SHOWED YOU THAT?

1  A.  NO.

2  Q.  DID YOU GET THE SUBPOENA ASKING FOR THAT

3      INFORMATION?

4  A.  NO, I DID NOT.

5  Q.  OKAY.  THAT WAS SERVED ON YOUR DEPARTMENT ON

6      FRIDAY.

7  A.  ON THIS PAST FRIDAY?

8  Q.  YES.

9  A.  I HAVEN'T EVEN BEEN AT WORK SINCE THEN.

10  Q.  OKAY.  THEY DON'T KNOW HOW TO COMMUNICATE WITH

11      YOU?

12  A.  NOT OVER WEEKENDS IF I'M OFF.

13  Q.  NOT OVER THE WEEKENDS.  AND YOU'RE SAYING THAT

14      THERE'S NO -- THERE'S NO COMMUNICATION RECORD

15      WHERE YOU CALLED THE OTHER OFFICERS, THAT EXISTS?

16  A.  NO.  THAT -- THE CHANNEL THAT WE USE IS NOT

17      RECORDED.

18  Q.  OKAY.  ISN'T IT THE CASE THAT A COUPLE OF YEARS

19      AGO THEY WERE RECORDED?

20  A.  I HAVE NO IDEA.

21  Q.  AND IS -- AREN'T THERE LOGS THAT YOU KEEP WHEN

22      YOU MAKE A STOP?

23  A.  NO, THERE IS NOT.

24  Q.  DID THERE USED TO BE?

25  A.  I HAVE ---

```
 1   Q.   AS FAR AS YOU KNOW, NOBODY EVER KEPT LOGS?

 2   A.   NOT TO -- NOT SINCE I'VE BEEN THERE.

 3   Q.   OKAY.  SO, THERE'S NO RECORD AT ALL OF THE TIME

 4        OF YOUR STOP?

 5   A.   NONE.

 6   Q.   OKAY.  DID YOU EVER -- DID YOU WRITE A TRAFFIC

 7        TICKET?

 8   A.   TO MR. BURCHAM?

 9   Q.   YES.

10   A.   NO, I DID NOT.

11   Q.   OKAY.  AND HOW MANY TRAFFIC TICKETS HAD YOU

12        WRITTEN IN THAT PERIOD OF TIME, SAY, A FEW DAYS

13        BEFORE OR A FEW DAYS AFTER?

14   A.   I HAVE NO -- NO CLUE.

15   Q.   DO YOU HAVE -- DO YOU HAVE COPIES OF THOSE

16        TICKETS?

17   A.   NO.  I DO NOT MAKE COPIES OF THEM.

18   Q.   AND WHAT DO YOU DO WITH THE TICKET?

19   A.   TURN THEM IN.

20   Q.   TURN THEM IN TO WHOM?

21   A.   TO THE OFFICE AND WHERE IT GOES FROM THERE, I

22        DON'T KNOW.

23   Q.   OKAY.  BUT THE OFFICE, OBVIOUSLY, THE POLICE

24        DEPARTMENT WOULD STILL HAVE COPIES OF THOSE

25        TICKETS?
```

1  A.   I'M SURE CITY COURT WOULD.

2  Q.   SO, YOU DON'T EVEN THINK THE POLICE DEPARTMENT

3       KEEPS A COPY WHEN THEY TURN IT OVER TO CITY COURT

4       FOR ---

5  A.   I DON'T KNOW.  ONCE I TURN IT IN, THAT'S BEYOND

6       MY SCOPE, AND I DON'T KNOW WHERE -- WHAT CHANNELS

7       THEY GO THROUGH OR ANYTHING.

8  Q.   OKAY.  DO YOU REMEMBER ANY TRAFFIC TICKETS YOU

9       ISSUED THAT DAY?

10  A.   I DON'T BELIEVE -- ACTUALLY, I BELIEVE MR.

11       BURCHAM WAS THE FIRST VEHICLE I STOPPED THAT DAY.

12  Q.   OKAY.  AND YOU SAID THAT IT WAS -- HE WAS

13       TRAVELING -- AT FIRST YOU SPOT HIM.  YOU THOUGHT

14       HE MIGHT BE GOING FAST, RIGHT?

15  A.   CORRECT.

16  Q.   YOU ALSO NOTICED HE HAD FLORIDA PLATES, CORRECT?

17  A.   NO, I DID NOT.

18  Q.   YOU DIDN'T NOTICE THAT?  YOU PUT THAT IN YOUR

19       REPORT, CORRECT?

20  A.   I STATED THAT I STOPPED A VEHICLE THAT HAD

21       FLORIDA -- THAT WAS BEARING FLORIDA TAGS, YES.

22  Q.   OKAY.  YOU'VE -- HOW MANY REPORTS DID YOU

23       PREPARE?  HOW MANY POLICE REPORTS DID YOU PREPARE

24       RELATIVE TO THIS STOP?

25  A.   JUST THIS ONE.

1  Q.  JUST THE ONE.

2  A.  YOU HAVE -- WELL, YOU HAVE THE INITIAL, THE

3      OFFENSE, AND I BELIEVE I DID A SUPPLEMENTAL.

4  Q.  OKAY.  YOU DID A SUPPLEMENTAL?

5  A.  I BELIEVE SO.  I'D HAVE TO GO BACK AND CHECK --

6      CHECK TO MAKE SURE.  I DON'T KNOW.

7  Q.  DO YOU HAVE A COPY OF THAT?

8  A.  NO.

9          MR. DIGIULIO: YOUR HONOR, I WOULD LIKE

10             TO ASK UNDER 26.2 JENCKS ACT, FOR COPIES

11         OF ANY REPORTS THAT THE OFFICER MAY HAVE

12         MADE.  I HAVE THE INITIAL REPORT.  BUT IF HE

13         DID A SUPPLEMENTAL REPORT, I WOULD LIKE A

14         COPY OF THAT.

15         THE COURT: MR. FLOWERS, I ASSUME THE

16             GOVERNMENT WOULDN'T OBJECT TO PROVIDING

17         THAT?

18         MR. FLOWERS: NO OBJECTION, YOUR HONOR, IF

19             IT EXISTS.

20         THE COURT: VERY WELL.  I WOULD APPRECIATE

21             IT IF YOU WOULD JUST  -- IT MAY OR MAY

22         NOT BE JENCKS ACT MATERIAL.  I MEAN,

23         OBVIOUSLY, IF IT'S JENCKS, THEN THE TIMING IS

24         GOVERNED BY 18 USC 3500.  BUT I WOULD

25         APPRECIATE IT IF YOU COULD AT LEAST TURN THAT

1              INFORMATION OVER TO MR. DIGIULIO AS SOON AS

2              POSSIBLE.

3              MR. FLOWERS: YES, YOUR HONOR.

4              THE COURT: THANK YOU.

5    MR. DIGIULIO:

6    Q.   YOU REVIEWED YOUR REPORT THIS MORNING?

7    A.   YES.

8    Q.   OKAY.  AND ---

9              MR. DIGIULIO: MAY I APPROACH, YOUR HONOR?

10              THE COURT: YES.

11   MR. DIGIULIO:

12   Q.   IS THAT YOUR REPORT?

13   A.   YES, IT IS.

14   Q.   OKAY.  AND THE FIRST PARAGRAPH YOU SAY YOU

15        "OBSERVED A 2014 AUDI BEARING FLORIDA PLATES,

16        APPEARED TO BE TRAVELING FASTER."

17   A.   CORRECT.

18   Q.   OKAY.  ISN'T IT FAIR TO SAY THAT OUT OF STATE

19        PLATES ARE ONE OF THE THINGS THAT YOU LOOK FOR

20        WHEN YOU MAKE THESE STOPS?

21   A.   NO, IT IS NOT.

22   Q.   IT'S NOT.

23   A.   NO.

24   Q.   OKAY.  BUT IF YOU COULD PROVIDE THE TICKETS, THAT

25        WOULD INDICATE WHETHER OR NOT THAT'S A FACT?

1  A.   YES.

2  Q.   OKAY.  NOW, YOU -- YOU INDICATE THE OTHER REASONS

3      FOR THE STOP WERE THAT THE VEHICLE WAS MOVING

4      WITHIN ITS LANE, CORRECT?

5  A.   YES.

6  Q.   AND HOW WIDE IS THE TRAFFIC LANE ON THAT PART OF

7      THE INTERSTATE, IF YOU KNOW?

8  A.   I DON'T -- APPROXIMATELY TEN FEET.

9  Q.   AND HOW -- HOW MUCH LEEWAY IS THERE FROM -- WITH

10      THE AVERAGE CAR FROM SIDE TO SIDE?

11  A.   I DON'T KNOW.

12  Q.   SO, LET ME GUESS THAT YOU HAVE ISSUED TRAFFIC

13      TICKETS OVER THE YEARS FOR IMPROPER LANE USAGE

14      WHEN A CAR GETS OUT OF ITS LANE, CORRECT?

15  A.   CORRECT.

16  Q.   BUT IN THIS CASE THAT DIDN'T HAPPEN?

17  A.   NO.  I DID NOT ISSUE ANY CITATION.

18  Q.   OKAY.  AND DID YOU EVER CHECK TO SEE WHETHER

19      THERE WAS ANYTHING ACTUALLY UNUSUAL ABOUT THOSE

20      BRAKE LIGHTS?

21  A.   WE COULDN'T DETERMINE IF IT -- IF IT'S NOT.  I'M

22      NOT AN ELECTRICIAN.  I'M NOT A MECHANIC.

23  Q.   OKAY.

24  A.   BUT HE STATED THAT THAT'S THE WAY IT CAME FROM

25      THE FACTORY.  I HAD TO TAKE HIM ON HIS WORD.

1  Q.  OKAY.  AND IF HE IS APPLYING HIS BRAKES, THAT

2      COULD BE JUST TRYING TO SLOW DOWN, CORRECT?

3  A.  COULD BE MANY REASONS.

4  Q.  NOW, SO, THAT'S YOUR STOP.  OKAY?  NOW, LET'S GO

5      TO THE THINGS THAT YOU FOUND SUSPICIOUS WHEN YOU

6      TALKED TO MR. BURCHAM AFTER THE STOP.

7  A.  OKAY.

8  Q.  YOU INDICATED THAT YOU DIDN'T LIKE HIS ANSWER

9      THAT HE WAS "BY COLORADO."  THAT'S ONE OF THE

10     REASONS, CORRECT?

11 A.  YES.

12 Q.  AND YOU ALSO SAY IN YOUR REPORT THAT SOME OF HIS

13     ANSWERS WERE, YOU USED, ELONGATED?

14 A.  CORRECT.

15 Q.  CAN YOU GIVE ME AN EXAMPLE OF AN ELONGATED

16     ANSWER?

17 A.  WHEN YOU ASK SOMEONE A QUESTION AND THEN THEY

18     HAVE TO THINK ABOUT IT AND THEY GO, "UM," AND

19     THEN THEY GIVE AN ANSWER.  THAT'S ELONGATED.

20 Q.  OKAY.  AND HAVE YOU EVER STOPPED PEOPLE THAT

21     WEREN'T CARRYING CONTRABAND THAT APPEARED TO BE

22     NERVOUS?

23 A.  SURE.

24 Q.  HAVE YOU EVER STOPPED PEOPLE THAT -- WHOSE

25     ANSWERS SEEMED TO BE ELONGATED?

USA VS. JESSE A. BURCHAM, SUPPRESSION HEARING, 8-8-16  **41**

1  A.   SURE.

2  Q.   NOW, THE ONLY OTHER THING THAT YOU MENTIONED THAT

3       WOULD AROUSE YOUR SUSPICIONS WAS THE FACT THAT HE

4       SAID HE DID NOT HAVE A GUN.  BECAUSE HE TOLD YOU

5       HE WAS IN PRIVATE SECURITY?

6  A.   CORRECT.

7  Q.   AND HE WAS TRAVELING BY HIMSELF, RIGHT?

8  A.   CORRECT.

9  Q.   OKAY.  THERE'S NOBODY THERE TO PROTECT HIM?

10 A.   CORRECT.

11 Q.   ALL RIGHT.  LET ME SPECULATE ALSO THAT YOU MADE

12      STOPS WHERE SOMEBODY HAVING A GUN IS USED AGAINST

13      THEM IN TERMS OF SUSPICION?

14 A.   I'M SORRY.  REPEAT THAT.

15 Q.   HAVE YOU -- HAVE YOU EVER USED THE FACT OF

16      SOMEONE POSSESSING A GUN AS GROUNDS TO SUSPECT

17      THEM OF ILLEGAL CONDUCT?

18 A.   NO.

19 Q.   YOU NEVER HAVE?

20 A.   NO.

21 Q.   SO, YOU NEVER FIND THE PRESENCE OF A GUN

22      SUSPICIOUS, JUST THE ABSENCE OF A GUN?

23 A.   IN THIS SITUATION, YES.

24 Q.   OKAY.  AND THAT'S IT IN TERMS OF YOUR -- YOUR

25      SUSPICION WHERE YOU WOULD GO BEYOND THE TRAFFIC

| | |
|---|---|
| 1 | STOP AND LOOK FOR SOMETHING ELSE, RIGHT? |
| 2 | A.   CORRECT. |
| 3 | Q.   NOW, THE -- YOU -- YOU SAY IT'S A TRAFFIC STOP, |
| 4 | BUT YOU DIDN'T RUN HIS PLATES, CORRECT? |
| 5 | A.   I HADN'T AT THAT TIME.  NO. |
| 6 | Q.   DID YOU -- DID YOU RUN HIS DRIVER'S LICENSE? |
| 7 | A.   NOT AT THAT TIME.  NO. |
| 8 | Q.   DID YOU RUN HIS INSURANCE CARD? |
| 9 | A.   THERE'S NO WAY TO RUN INSURANCE. |
| 10 | Q.   PARDON? |
| 11 | A.   THERE'S NO WAY TO RUN INSURANCE. |
| 12 | Q.   DID YOU CHECK TO SEE THAT HE HAD INSURANCE? |
| 13 | A.   YES, HE DID. |
| 14 | Q.   OKAY.  BUT YOU MADE NO COMMUNICATION WITH ANY |
| 15 | KIND OF A SYSTEM THAT REPORTS ON TRAFFIC |
| 16 | VIOLATIONS OR WARRANTS? |
| 17 | A.   NO, I DID NOT. |
| 18 | Q.   OKAY.  NOW, YOU ALSO SAY THAT OFFICER COWART CAME |
| 19 | TO THE SCENE? |
| 20 | A.   YES. |
| 21 | Q.   DOESN'T HE USUALLY HAVE A DOG WITH HIM? |
| 22 | A.   YES. |
| 23 | Q.   DID HE RUN THE DOG? |
| 24 | A.   NO. |
| 25 | Q.   HE LEFT THE DOG IN THE CAR? |

1    A.   YES.  WE DON'T NEED -- AT THIS -- AT THIS

2         SITUATION, WE DIDN'T NEED TO RUN A DOG.

3    Q.   OKAY.  AND THEN YOU -- AND HOW MANY OFFICERS WERE

4         PARTICIPATING IN THAT SEARCH?

5    A.   ME AND MR. -- ME AND OFFICER COWART.

6    Q.   JUST THE TWO OF YOU?

7    A.   AS FAR AS MY RECOLLECTION, YES.

8    Q.   BUT THERE WERE OTHER OFFICERS ON THE SCENE,

9         RIGHT?

10   A.   CORRECT.

11   Q.   OKAY.  NOW, WHEN YOU DECIDED THAT THERE MIGHT BE

12        A HIDDEN COMPARTMENT, THAT'S WHEN YOU ARRESTED

13        JESSE BURCHAM, RIGHT?

14   A.   NEGATIVE.  HE WAS DETAINED.

15   Q.   SO, YOU PUT HANDCUFFS ON HIM, RIGHT?

16   A.   YES.

17   Q.   YOU ADVISED HIM OF HIS RIGHTS PER MIRANDA, RIGHT?

18   A.   CORRECT.

19   Q.   AND THAT'S NOT AN ARREST IN YOUR MIND?

20   A.   NO, IT'S NOT.

21   Q.   OKAY.  AND -- AND YOU MADE IT REAL CLEAR THAT MR.

22        BURCHAM WAS NOT ALLOWED TO LEAVE?

23   A.   CORRECT.

24   Q.   AND WHERE DID YOU TAKE THE CAR AND MR. BURCHAM?

25   A.   TO OUR OFFICE.

Case 3:15-cr-00173-BAJ-EWD  Document 44  08/22/16  Page 44 of 102

1  Q.   WHICH IS WHERE?

2  A.   ON ACADIAN THRUWAY.

3  Q.   THAT'S THE DEA OFFICE?

4  A.   CORRECT.

5  Q.   OKAY.  AND WHEN YOU SAY, "OUR OFFICE," IT'S THE

6       DEA OFFICE, YOU'RE TALKING ABOUT THE FACT THAT --

7       YOU'RE ACKNOWLEDGING THE FACT THAT YOUR

8       INTERDICTION UNIT WORKS WITH THE DEA, CORRECT?

9  A.   CORRECT.

10  Q.   OKAY.  AND YOU HAVE NO OTHER -- THERE'S NO TIME

11       RECORD OF WHEN YOU -- THE TIME YOU HANDCUFFED MR.

12       BURCHAM AND ADVISED HIM OF HIS RIGHTS AND THEN

13       TOOK HIM TO DEA HEADQUARTERS, AT THAT TIME YOU

14       HAD FOUND NO DRUGS, CORRECT?

15  A.   NOT DURING THE TRANSPORTATION OF HIM AND THE

16       VEHICLE.  NO.

17  Q.   OR THE SEARCH OF THE VEHICLE?

18  A.   NO.  NOT AT THE TIME.  NO.

19  Q.   OKAY.  ALL YOU FOUND WAS JUST SUSPICIOUS, YOU

20       THINK, COMPARTMENT?

21  A.   CORRECT.  AND IT TURNED OUT TO BE.

22  Q.   AT THE TIME THAT YOU --

23  A.   YES.

24  Q.   -- IT TURNED OUT TO BE, YES?

25  A.   YES.

1  Q.  BUT AT THE TIME THAT YOU HANDCUFFED HIM AND READ

2      HIM HIS RIGHTS, THERE WERE NO DRUGS FOUND,

3      CORRECT?

4  A.  NOT AT THAT TIME, NO.

5  Q.  AND YOU HAVE NO RECORD OF HOW MUCH TIME HAS

6      ELAPSED BETWEEN YOUR STOP, THE QUESTIONING THAT

7      YOU DID, THE CALLING OF THE OTHER OFFICERS, THE

8      PLACING OF HANDCUFFS AND THE TAKING HIM TO DEA

9      HEADQUARTERS?

10 A.  NO.

11 Q.  CORRECT?  NOTHING TO RECORD THOSE TIMES AT ALL?

12 A.  NO.

13 Q.  WOULD YOU LOOK FOR ANY SUPPLEMENTAL REPORTS THAT

14     YOU HAVE MADE AFTER YOU LEAVE HERE AND PROVIDE

15     THEM TO MR. FLOWERS AND THEN HE CAN PROVIDE THEM

16     TO ME?

17 A.  SURE.

18         MR. DIGIULIO: I THINK THAT'S ALL I HAVE,

19             YOUR HONOR.  THANK YOU.

20         THE COURT: OKAY.  ANY REDIRECT?

21         MR. FLOWERS:  YES, YOUR HONOR.

22                 REDIRECT EXAMINATION

23 MR. FLOWERS:

24 Q.  OFFICER JENKINS, YOU HAVE TESTIFIED BEFORE THAT

25     ON THE INTERDICTION TEAM THAT YOU MAKE TRAFFIC

1          STOPS?

2    A.   CORRECT.

3    Q.   RIGHT.  AND YOU WEREN'T ABLE TO SAY HOW MANY

4          TIMES YOU'VE GIVEN A TICKET?

5    A.   I DON'T KNOW.  TRAFFIC -- WHEN YOU'RE ENFORCING

6          TRAFFIC, IT DOES NOT MEAN THAT YOU HAVE TO WRITE

7          A TICKET.  JUST THE SIMPLE FACT OF PULLING THEM

8          OVER, ACKNOWLEDGING THEM OF THE TRAFFIC

9          INFRACTION AND USE OUR OWN DISCRETION ON WHETHER

10         OR NOT YOU ISSUE A CITATION OR NOT.  THAT'S STILL

11         ENFORCING THE LAW.

12   Q.   SO, DO YOU GIVE A TICKET EVERY TIME YOU MAKE A

13         STOP?

14   A.   NO.

15   Q.   DO YOU GIVE SOME TYPE OF WRITTEN WARNING OR

16         ANYTHING?

17   A.   NO.  THERE'S NO WRITTEN WARNING.  A LOT OF TIMES,

18         YOU KNOW, JUST, "HAVE A GOOD DAY."

19   Q.   THANK YOU.  AND HOW MANY DAYS IN A WEEK DO YOU

20         WORK?

21   A.   FOUR-TO-FIVE DAYS A WEEK.

22   Q.   AND HOW MANY HOURS?

23   A.   TEN-HOUR SHIFTS.

24   Q.   OKAY.  AND IN ONE WEEK CAN YOU ESTIMATE HOW MANY

25         TRAFFIC STOPS YOU GENERALLY MAKE?

1   A.   THIRTY, 40, 50.  I HAVE NO EXACT NUMBER.

2   Q.   OKAY.  AND THAT'S EVERY WEEK?

3   A.   CORRECT.

4   Q.   OKAY.  WHEN YOU MAKE A TRAFFIC STOP ARE THERE ANY

5        TYPE OF REQUIREMENTS THAT YOU HAVE TO DO CERTAIN

6        THINGS ON EACH OF THESE STOPS?

7   A.   NO.

8   Q.   ANY KIND OF STANDARD OPERATING PROCEDURE?

9   A.   NO.

10  Q.   DO YOU HAVE TO ASK FOR LICENSE AND REGISTRATION?

11  A.   WELL, YOU HAVE TO ASK FOR LICENSE AND

12       REGISTRATION FOR -- TO IDENTIFY WHO'S DRIVING.

13       ALSO, REGISTRATION, YOU -- IS THIS THEIR VEHICLE.

14       IS IT STOLEN?  IS IT, YOU KNOW, IS THEIR

15       REGISTRATION CURRENT?  SO, THAT'S ALL PART OF

16       TRAFFIC INFRACTION, ALSO.

17  Q.   OKAY.  WHAT ABOUT RUNNING A LICENSE PLATES AND

18       BACKGROUND CHECKS, DO YOU HAVE TO DO THOSE THINGS

19       ALSO?

20  A.   WE DON'T HAVE TO.

21  Q.   OKAY.

22            MR. FLOWERS: THOSE ARE ALL THE QUESTIONS

23                 I HAVE, YOUR HONOR.

24            THE COURT: OKAY.  THANK YOU, MR. FLOWERS.

25                 OFFICER, I HAVE JUST A FEW QUESTIONS FOR

1        YOU.

2              FIRST.  YOU TESTIFIED THAT THE REAR

3        LIGHTS OF THE CAR WERE BRIGHTER THAN NORMAL.

4        YOU TESTIFIED THAT THEY WERE LIKE BRAKE

5        LIGHTS.  DID YOU EVER CONFIRM -- FIRST OF

6        ALL, WAS THE REAR, YOU KNOW THAT REAR, MIDDLE

7        BRAKE LIGHT, WAS THAT ON?

8        THE WITNESS: I COULDN'T TELL.

9        THE COURT: OKAY.  DID AT ANY TIME YOU CONFIRM

10             THAT THE LIGHTS WERE, IN FACT, BRIGHTER,

11       THAT IT WAS MORE THAN JUST YOUR SUSPICION

12       THAT IT WAS BRIGHTER?

13       THE WITNESS: NO.  WE -- ONCE -- ACTUALLY

14             WHENEVER DURING MY INTERVIEW, MR.

15       BURCHAM, AND HE SAID IT CAME FROM THE FACTORY

16       LIKE THAT.  ONCE I STARTED ADDRESSING THE

17       OTHER INFRACTIONS THAT I OBSERVED, MY

18       SUSPICIONS ON -- TO TAKE THIS FURTHER HAD

19       ALREADY KICKED IN AND HONESTLY I DIDN'T THINK

20       TO CHECK THAT.

21       THE COURT: OKAY.  NOW, YOU AT SOME POINT

22             CONCLUDED THAT HE WAS SPEEDING.  DID YOU

23       USE A SPEED GUN OR HOW DID YOU DETERMINE?

24       THE WITNESS: I WAS PACING HIM.

25       THE COURT: OKAY.  AND YOU WERE DOING 69?

1       THE WITNESS: CORRECT.

2       THE COURT: NOW, DURING THE TIME THAT YOU

3           REQUESTED CONSENT, DID YOU AT ANY TIME

4       INFORM HIM THAT IT WAS HIS RIGHT TO DENY

5       CONSENT?

6       THE WITNESS: HE DIDN'T ASK.  IN MY

7           EXPERIENCE, THEY EITHER SAY YES OR NO.

8       IF THEY SAY NO, THEN THAT'S WHENEVER WE

9       UTILIZE THE -- A CANINE.

10      THE COURT: BUT AT NO TIME DID YOU TELL

11          HIM HE COULD REFUSE CONSENT?

12      THE WITNESS: NO.

13      THE COURT: ALL RIGHT.  WAS THERE ANYTHING

14          ELSE THAT YOU LEARNED ABOUT MR. BURCHAM,

15      IN YOUR DISCUSSIONS WITH HIM UP TO THAT

16      POINT, OTHER THAN HIS OCCUPATION?

17      THE WITNESS: NO, THAT WAS IT.

18      THE COURT: NOW, WHEN EXACTLY DID YOU FIND

19          OR WERE THE DRUGS CONCEALED IN THE CAR,

20      DISCOVERED?

21      THE WITNESS: WHEN WERE THEY?

22      THE COURT: YES.

23      THE WITNESS: AFTER -- WELL, ONCE WE -- ONCE

24          WE GOT BACK TO THE OFFICE AND WE USED

25      THE DRILL BIT, THAT'S WHENEVER WE CONFIRMED

1          THAT IT WAS LOADED WITH COCAINE.

2          THE COURT: OKAY.  SO, TELL ME -- WELL, WAS

3               THE DEFENDANT UNDER ARREST AT THAT

4          POINT?

5          THE WITNESS: AT THAT POINT?

6          THE COURT: YES.

7          THE WITNESS: NO.

8          THE COURT: HE WAS -- BUT HE WAS DETAINED?

9          THE WITNESS: HE WAS STILL DETAINED. YES.

10         THE COURT: SO, HELP ME UNDERSTAND.  YOU

11              HAD THE DRUG DOG THERE.  WHY DIDN'T YOU

12         RUN THE DRUG DOG AT ANY POINT BEFORE THE CAR

13         REACHED THE DEA OFFICE?

14         THE WITNESS: BECAUSE OF THE FACT THAT HE

15              HAD GIVEN US CONSENT.  WE DON'T NORMALLY

16         RUN A DOG ON THE VEHICLE THAT'S -- THAT THEY

17         GIVE US CONSENT.  IN THIS SITUATION, ONCE THE

18         -- THE COMPARTMENT WAS LOCATED, IT WAS JUST A

19         MATTER OF JUST TRYING TO GET OFF THE

20         INTERSTATE AND GET TO A SAFE LOCATION.

21         THE COURT: SO, LET'S TALK ABOUT THAT

22              COMPARTMENT.  PLEASE DESCRIBE FOR ME

23         AGAIN WHAT FACTORS OR WHAT ABOUT THAT BUMPER

24         SUGGESTED TO YOU THAT IT MAY HAVE BEEN

25         REMOVED OR REPLACED?

**CLARE SMITH-NEELY, CERTIFIED COURT REPORTER (225) 751-8111**

1          THE WITNESS: THE -- THERE'S BOLTS AND SCREWS

2              ON THE INNER FENDER WELL THAT CONNECT

3          THE FENDER WELL TO THE BUMPER.  THOSE HAD

4          TOOLING MARKS ON IT TO WHERE THE PAINT AND

5          ALL HAD BEEN REMOVED FROM A TOOL, INDICATING

6          THAT IT HAD RECENTLY BEEN REMOVED.  ONCE WE

7          NOTICED THAT, THEN THAT'S WHENEVER WE STARTED

8          INSPECTING THE WHOLE AREA, LOOKED UNDERNEATH.

9          AND AS SOON AS WE LOOKED UNDERNEATH, YOU

10          COULD SEE THE RECTANGLE BOX FROM BELOW.

11          THE COURT: OKAY.  DO YOU HAVE ANY PHOTOS

12              OF THAT?

13          THE WITNESS: I WOULD HAVE TO CHECK TO

14              MAKE SURE.  BUT I THINK I'M PRETTY SURE

15          WE TOOK PHOTOS.

16          THE COURT: MR. FLOWERS?

17          MR. FLOWERS: IF I COULD JUST HAVE A MOMENT?

18          THE COURT: SURE.

19          MR. FLOWERS: YOUR HONOR, I DON'T HAVE ANY

20              PHOTOS WITH ME.  BUT I CAN SEE IF I CAN

21          SEND SOMEONE DOWN TO GET THEM BEFORE THE

22          CONCLUSION OF THE HEARING.

23          THE COURT: VERY GOOD.  THANK YOU.

24              ALL RIGHT.  SO, YOU ALSO TALKED ABOUT

25          THE POSITION OF THE SCREWS.  TELL ME WHAT

1      ABOUT THE POSITION OF THE SCREWS SEEMED

2      SUSPICIOUS TO YOU.

3      THE WITNESS: WELL, IT'S JUST THE HEAD OF

4           THE SCREW HAD TOOLING ON IT.

5      THE COURT: AND WHEN YOU SAY, "TOOLING ON

6           IT," WHAT ARE YOU REFERRING TO?

7      THE WITNESS: WELL, WHENEVER -- WHENEVER THE

8           VEHICLE COMES FROM THE FACTORY,

9      EVERYTHING IS PAINTED.  ESPECIALLY THESE,

10     THEY'RE PAINTED BLACK SO THAT THEY MATCH.

11     THE COURT: WAS THE CAR -- THE COLOR OF THE

12          CAR WAS BLACK?

13     THE WITNESS: NO.  THE INNER FENDER WELL WAS

14          BLACK.

15     THE COURT: OKAY.

16     THE WITNESS: SO IT MATCHES THAT.  BUT ANY

17          TIME YOU USE A TOOL TO REMOVE THOSE, IT

18     LEAVES TOOLING MARKS WHERE IT CHIPS THE PAINT

19     AWAY.  SO, YOU CAN SEE BARE METAL FROM --

20     FROM WHERE THE PAINT HAD BEEN CHIPPED AWAY.

21     THE COURT: OKAY.  AND TELL ME ONCE AGAIN

22          ABOUT THE DRAIN HOLE AND WHY THAT DREW

23     YOUR SUSPICION.

24     THE WITNESS: THE DRAIN HOLE, LIKE I SAID,

25          IT'S GOT A RUBBER -- A RUBBER GROMMET

1        TYPE THAT COVERS IT.  WHEN YOU PULL IT OPEN,

2        IT SHOULD BE A HOLE THAT LEADS DIRECTLY

3        OUTSIDE OF THE CAR.  WELL, THIS SITUATION

4        HERE, THERE WAS METAL THAT WAS BLOCKING IT,

5        WHICH WOULD HAVE KEPT IT FROM BEING

6        EFFECTIVE FROM THE FACTORY.

7     THE COURT: ALL RIGHT.  THANK YOU.  SO,

8        YOU ALL WERE PRETTY SURE AT THAT POINT

9        THAT THE CAR CONTAINED CONCEALED DRUGS?

10    THE WITNESS: WE KNEW THAT IT CONTAINED A

11       COMPARTMENT.  WE DID NOT KNOW WHAT WAS

12       IN THE COMPARTMENT.

13    THE COURT: NOW, IS IT THE CASE, AND I'VE

14       HEARD SOME TESTIMONY IN PRIOR CASES,

15    ALTHOUGH CERTAINLY NOT IN THIS CASE, WHERE

16    WHEN POLICE OFFICERS STOP A CAR ON THE

17    HIGHWAY OR ANYONE ELSE, FOR THAT MATTER, THEY

18    USUALLY CALL IN TO DISPATCHER TO NOTIFY THEM

19    THAT THEY'RE MAKING A STOP.  DID YOU DO THAT

20       IN THIS CASE?

21    THE WITNESS: NO.  WE DO NOT RELY THAT --

22       YOU KNOW, WE DON'T UTILIZE A DISPATCHER

23    WHEN WE'RE WORKING.  WE ALL FOUR WORK ON THE

24    SAME CHANNEL.  AND WHEN WE MAKE A STOP, WE

25       KNOW WHERE EACH OTHER IS AT.

1           THE COURT: SO YOU NOTIFY YOUR COLLEAGUES

2               THERE, BUT YOU DIDN'T NOTIFY A

3           DISPATCHER.  AND THEN SO -- AND I THINK I

4           KNOW THE ANSWER TO THIS, BUT I WANT TO GET IT

5           ON THE RECORD.  WAS THERE VIDEO OF THE STOP?

6           THE WITNESS: NO, SIR.  THERE WASN'T.

7           THE COURT: OKAY.  OFFICER, I THINK THAT

8               CONCLUDES YOUR TESTIMONY.  YOU ARE

9           EXCUSED.  THANK YOU FOR COMING IN TODAY.

10              OKAY.  THE GOVERNMENT MAY CALL ITS

11          NEXT WITNESS.

12          MR. FLOWERS: THE GOVERNMENT CALLS LUKE

13              COWART.

14          THE CLERK: RAISE YOUR RIGHT HAND.

15  THE WITNESS, LUKE COWART, AFTER HAVING FIRST BEEN DULY

16  SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING

17  BUT THE TRUTH, TESTIFIED AS FOLLOWS:

18                  DIRECT EXAMINATION

19  MR. FLOWERS:

20  Q.   SIR, WOULD YOU PLEASE STATE YOUR NAME AND SPELL

21       YOUR LAST NAME FOR THE RECORD?

22  A.   CORPORAL LUKE COWART.  COWART IS C-O-W-A-R-T.

23  Q.   AND ARE YOU CURRENTLY EMPLOYED, SIR?

24  A.   YES, SIR.  I'M WITH THE BATON ROUGE CITY POLICE.

25  Q.   AND WHAT IS YOUR RANK THERE?

1   A.   CORPORAL.

2   Q.   CORPORAL.  DO YOU JUST GO BY CORPORAL COWART?

3   A.   YES, SIR.

4   Q.   AND HOW LONG HAVE YOU BEEN WITH THE BATON ROUGE

5        CITY POLICE?

6   A.   APPROXIMATELY, EIGHT YEARS.

7   Q.   ARE YOU ASSIGNED TO A SPECIFIC UNIT WITHIN THE

8        BATON ROUGE CITY POLICE?

9   A.   YES, SIR.

10  Q.   AND WHAT UNIT IS THAT?

11  A.   THE NARCOTICS DIVISION AND THE HIGHWAY

12       INTERDICTION UNIT.

13  Q.   OKAY.  THE HIGHWAY INTERDICTION UNIT?

14  A.   YES, SIR.  ALSO REFERRED TO AS HIDTA.

15  Q.   OKAY.  IS THAT ASSOCIATED WITH DEA AT ALL?

16  A.   YES, SIR.  WE'RE ASSIGNED DIRECTLY TO THE BATON

17       ROUGE DEA OFFICE.

18  Q.   AND WHAT DOES THE HIDTA UNIT DO?

19  A.   WE CONDUCT HIGHWAY INTERDICTION.

20  Q.   AND WHEN YOU SAY, "INTERDICTION," WHAT DO YOU

21       MEAN?

22  A.   WE CONDUCT CRIMINAL ENFORCEMENT ON THE HIGHWAYS

23       IN BATON ROUGE.

24  Q.   SO, IS THAT JUST TRAFFIC STOPS OR ---

25  A.   CRIMINAL AND TRAFFIC ENFORCEMENT.  IT'S TRAFFIC

1       STOPS ON THE INTERSTATE.  WE ALSO WORK BUS

2       TERMINALS AT TIMES.  DID THAT ANSWER YOUR

3       QUESTION?

4    Q.  AND WHAT TYPE OF THINGS ARE YOU LOOKING FOR TO

5       INTERDICT?

6    A.  ANY KIND OF CRIMINAL ACTIVITY, REALLY.  PRIMARILY

7       FOCUS ON LARGE QUANTITIES OF NARCOTICS, BULK

8       CURRENCY WE BELIEVE TO BE DRUG PROCEEDS, AND

9       WEAPONS.

10   Q.  OKAY.  AND HOW LONG HAVE YOU BEEN ON THE HIDTA

11      TEAM?

12   A.  APPROXIMATELY, THREE YEARS.

13   Q.  ANY TYPE OF TRAINING THAT YOU'VE GONE THROUGH AS

14      A MEMBER OF THE HIDTA TEAM?

15   A.  YES, SIR.  I PROBABLY HAVE A COMBINED TOTAL OF

16      APPROXIMATELY FOUR WEEKS OF NARCOTIC CANINE

17      TRAINING, AND ALSO I'VE HAD APPROXIMATELY ONE

18      WEEK OF INTERDICTION TRAINING.  THAT PARTICULAR

19      SCHOOL WAS GEARED MORE TOWARDS COMMERCIAL

20      INTERDICTION AND LOCATING CONCEALED AND AFTER-

21      MARKET, HIDDEN COMPARTMENTS.

22   Q.  OKAY.  LET'S TALK A LITTLE BIT ABOUT THAT

23      TRAINING.  CAN YOU EXPLAIN TO THE COURT WHAT YOU

24      LEARNED IN THAT TRAINING?

25   A.  WELL, IT'S A PRETTY BROAD SUBJECT.  BUT ---

1  Q.  I'M SORRY.  LET ME -- THE PART ABOUT LOCATING

2      COMPARTMENTS ON VEHICLES.

3  A.  YES, SIR.  AND THAT, TOO, IS PRETTY BROAD.  BUT

4      THERE'S DIFFERENT TYPES OF COMPARTMENTS.  YOU

5      HAVE SOME THAT ARE OPERATED THAT WHERE THEY HAVE

6      MANUAL TRAP DOORS.  THE WAY YOU ACCESS IT IS MADE

7      BY MANUALLY REMOVING A PIECE OF THE CAR OR MAYBE

8      MANUALLY REMOVING A PLATE THAT ACCESSES THE

9      COMPARTMENT.  YOU HAVE SOME THAT ARE HYDRAULIC

10     OPERATED WHERE THE DOORS ON THE COMPARTMENTS ARE

11     ACTUALLY ON HYDRAULICS AND YOU HAVE TO FIND THE

12     RELAY TO POWER THE HYDRAULICS.  YOU ALSO HAVE

13     ELECTRONIC COMPARTMENTS THAT ARE MORE -- SUCH AS

14     TRUNK LATCHES MIGHT BE USED TO HOLD THE TRAP DOOR

15     CLOSED, STUFF LIKE THAT.  THERE'S INDICATORS THAT

16     WE LOOK FOR UNDER VEHICLES, SPECIFICALLY UNDER

17     VEHICLES TIED IN BY THESE COMPARTMENTS.  IF THE

18     -- IF THE COMPARTMENT CAN BE VISIBLE FROM

19     UNDERNEATH THE VEHICLE.

20 Q.  SO, IN ADDITION TO LEARNING ABOUT THE DIFFERENT

21     TYPES OF COMPARTMENTS, ARE YOU TRAINED TO -- HOW

22     TO LOCATE THESE?

23 A.  YES, SIR.  YES, SIR.

24 Q.  OKAY.

25 A.  AND THAT'S WHAT I WAS -- YOU KNOW, THERE ARE

USA VS. JESSE A. BURCHAM, SUPPRESSION HEARING, 8-8-16 **58**

1    DIFFERENT WAYS, IT DEPENDS ON WHERE THE
2    COMPARTMENT IS LOCATED. BUT, FOR INSTANCE,
3    UNDERNEATH THE VEHICLE. AND THERE'S PARTICULAR
4    THINGS WE LOOK FOR. WE LOOK FOR OVERSPRAY. WE
5    LOOK FOR FRESH TOOLING ON BOLTS OR NUTS OR
6    ANYTHING THAT CAN BE REMOVED WITH A TOOL. WE
7    LOOK TO SEE IF THERE IS ANY FRESH TOOLING OR, YOU
8    KNOW, IF A BOLT IS COVERED IN DUST, THEN
9    OBVIOUSLY IT HASN'T BEEN REMOVED RECENTLY. BUT
10   IF THERE IS SHINY, SHINY METAL, THERE'S NO DUST
11   THERE, SO OBVIOUSLY A TOOL HAS BEEN ON IT.
12   THAT'S ONE OF THE THINGS WE LOOK FOR, AN
13   INDICATOR. WHICH, OBVIOUSLY, THAT COULD ALSO BE
14   CONTRIBUTED TO SOMEBODY RECENTLY DOING
15   MAINTENANCE WORK.
16        SO, THE NEXT THING THAT WE LOOK FOR IS THE
17   ANGLES UNDERNEATH THE VEHICLE. MOST VEHICLES,
18   YOU WON'T FIND A 90-DEGREE WELD ON ANY VEHICLE.
19   IT'S TOO DANGEROUS. THE WELD BREAKS. SO, THE
20   VEHICLE MANUFACTURERS, IF THERE'S ANY AREAS ON A
21   VEHICLE THAT EITHER MAKE 90 DEGREES, THEY BEND IT
22   AT THAT LOCATION RATHER THAN WELDING IT.
23        ANOTHER THING IS THE OVERSPRAY. EITHER BARE
24   SHEETMETAL IS AN INDICATOR BECAUSE MOST VEHICLES
25   ARE PAINTED OR SOME KIND OF COATINGS ON IT. SO,

USA VS. JESSE A. BURCHAM, SUPPRESSION HEARING, 8-8-16   59

1          BARE METAL IS ONE INDICATOR.  AND ANOTHER
2          INDICATOR IS TOO MUCH OVERSPRAY, A DISCOLORATION,
3          THAT'S NOT CONSISTENT WITH THE REMAINDER OF THE
4          VEHICLE.
5    Q.    NOW, WHY DO YOU GO THROUGH A WHOLE TRAINING ON
6          LOCATING COMPARTMENTS ON VEHICLES; WHAT'S
7          SIGNIFICANT ABOUT THAT?
8    A.    WELL, BECAUSE IN A LOT OF CASES YOUR HIGHER END
9          DRUG SMUGGLERS AND THE CURRENCY SMUGGLERS AND
10         WEAPONS SMUGGLERS, YOUR -- YOUR HIGHER END GUYS
11         USE THESE TYPE OF COMPARTMENTS TO SMUGGLE THEIR
12         NARCOTICS, THEIR CURRENCY OR WEAPONS ACROSS THE
13         U.S.
14   Q.    AND HAVE YOU EVER COME INTO CONTACT WITH A
15         VEHICLE OTHER THAN, IN THIS PARTICULAR CASE
16         TODAY, THAT HAD ONE OF THESE COMPARTMENTS THAT
17         YOU'RE DESCRIBING?
18   A.    YES, SIR.
19   Q.    CAN YOU ESTIMATE HOW MANY TIMES?
20   A.    I DON'T WANT TO GIVE AN EXACT FIGURE.  PROBABLY
21         TEN OR 15 -- TEN TO 15.
22   Q.    AND OF THOSE TEN TO 15, WERE THERE -- WAS THERE
23         CONTRABAND IN THOSE COMPARTMENTS?
24   A.    I'VE LOCATED, I THINK, AT LEAST TWO THAT WERE
25         EMPTY AT THE TIME.  BUT THE REMAINING HAD

1　　　CONTRABAND IN THEM.

2　Q.　OKAY.  AND GOING BACK TO THE HIDTA TEAM.  WHO ALL

3　　　WAS ON THIS HIDTA TEAM WITH YOU?

4　A.　IN MY AGENCY?

5　Q.　YES.

6　A.　IT'S MYSELF, OFFICER BRAD BICKHAM, OFFICER RUSTY

7　　　JENKINS AND CORPORAL CODY DAVID.

8　Q.　OKAY.  NOW, YOU SAID IN YOUR AGENCY.  ARE THERE

9　　　OTHER AGENCIES THAT ARE ON THE ---

10　A.　YES, SIR.  OUR TASK -- WE'RE A TASK FORCE WITH

11　　　COMBINED AGENCIES.

12　Q.　ALL RIGHT.  SO, THERE ARE FOUR OF YOU ALL THAT

13　　　ARE ON THIS -- FROM BATON ROUGE?

14　A.　FROM BATON ROUGE.  YES, SIR.  FROM BATON ROUGE

15　　　P.D.

16　Q.　OKAY.  AND DO YOU ALL WORK TOGETHER AS A TEAM OR

17　　　ARE YOU OUT THERE BY YOURSELVES?

18　A.　WE'RE DEFINITELY A TIGHT-KNIT TEAM.  BUT THE --

19　　　WHEN WE'RE CONDUCTING TRAFFIC STOPS, A LOT OF

20　　　TIMES WE'RE BY OURSELVES WHEN WE CONDUCT THE

21　　　TRAFFIC -- THE INITIAL TRAFFIC STOP WE'LL BE BY

22　　　OURSELVES.

23　Q.　OKAY.  AND DO YOU WORK GENERALLY IN THE SAME AREA

24　　　OR ARE YOU ALL KIND OF SPREAD OUT ALL OVER BATON

25　　　ROUGE?

1    A.   WE TRY TO STAY PRETTY CLOSE TO EACH OTHER, AT

2         LEAST TWO OF US.  WE LIKE TO HAVE TWO OFFICERS

3         KIND OF PRETTY CLOSE TO EACH OTHER, JUST FOR

4         OFFICER SAFETY.

5    Q.   OKAY.  AND WHERE DO YOU PRIMARILY WORK, IF THERE

6         IS ANY SUCH PRIMARY LOCATION?

7    A.   THERE IS NOT.  IT'S -- IT'S PRETTY -- I MEAN,

8         FROM THE CITY LIMITS FROM THE MISSISSIPPI RIVER

9         BRIDGE, ALL THE WAY JUST PAST THE AMITE RIVER.

10        THE WHOLE STRETCH OF INTERSTATE OF I-10, I-12,

11        THROUGH THE BATON ROUGE CITY LIMITS.  WE VARY OUR

12        ENFORCEMENT AREAS.

13   Q.   OKAY.  SO, YOU JUST FOCUS ON THE INTERSTATE OR DO

14        YOU WORK IN SIDE STREETS, AS WELL?

15   A.   NO.  WE JUST FOCUS ON THE INTERSTATES.

16   Q.   OKAY.  AND WHY IS THAT?

17   A.   THAT'S WHERE WE HAVE THE MOST SUCCESS.

18   Q.   OKAY.  AND SINCE YOU ALL -- YOU DON'T RIDE IN THE

19        SAME CAR WITH EACH OTHER; IS THAT WHAT YOU WERE

20        SAYING?

21   A.   AT TIMES, BUT MOST OF THE TIME, NO.  WE'RE BY

22        OURSELVES, SOLO OFFICER CONDUCTING A TRAFFIC STOP

23        BY OURSELVES.

24   Q.   OKAY.  AND HOW DO YOU ALL STAY IN CONTACT WITH

25        EACH OTHER; HOW DO YOU COMMUNICATE?

1  A.  WITH THE PORTABLE RADIO ISSUED TO US.

2  Q.  OKAY.  DO YOU EVER USE YOUR INDIVIDUAL CELL

3      PHONES OR TO TEXT OR E-MAIL OR TALK TO EACH

4      OTHER?

5  A.  I MEAN, YES, WE TALK TO EACH OTHER.  BUT IT'S

6      MORE ON A -- I GUESS WE USE OUR CELL PHONES FOR

7      MORE OF A PERSONAL BASIS.  WE -- IF WE'RE OUT

8      THERE WORKING, WE HAVE A QUESTION ABOUT SOMETHING

9      THAT WE'RE DOING AT WORK, WE USE THE RADIOS.

10 Q.  ALL RIGHT.  NOW, I WANT TO DIRECT YOUR ATTENTION

11     TO THE TRAFFIC STOP THAT OCCURRED ON MAY 3RD OF

12     2015, INVOLVING JESSE BURCHAM.  DO YOU RECALL

13     THAT?

14 A.  YES, SIR.

15 Q.  OKAY.  AND HOW DID YOU GET INVOLVED IN THAT?

16 A.  OFFICER RUSTY JENKINS CAME OVER THE RADIO AND

17     SAID THAT HE WAS PREPARING TO SEARCH A VEHICLE.

18     WHEN I HEARD THAT, I WENT OVER THERE TO HIM.

19     WHEN I GOT THERE, HE HAD ALREADY BEGAN SEARCHING

20     THE VEHICLE.  AND I FELL IN AND BEGAN ASSISTING

21     HIM IN THE SEARCH.

22 Q.  OKAY.  YOU SAID HE RADIOED TO YOU?

23 A.  YES, SIR.

24 Q.  SO, WERE YOUR CELL PHONES USED DURING THIS

25     PARTICULAR STOP TO COMMUNICATE WITH EACH OTHER?

1  A.   NO, SIR.

2  Q.   SO, WHAT HAPPENED ONCE HE RADIOED FOR YOU?

3  A.   I RESPONDED.  AND I -- HE DIDN'T SPECIALLY CALL

4       ME.  HE JUST BASICALLY MADE THE -- A COMMON

5       PRACTICE FOR US TO DO IS WHENEVER WE'RE GOING --

6       IF WE'RE GOING TO TAKE A TRAFFIC STOP FURTHER,

7       SUCH AS SEARCHING A VEHICLE, WE'RE JUST COMING

8       OVER THE RADIO AND SAYING, "HEY, I'M GOING TO

9       SEARCH THIS VEHICLE," JUST TO MAKE ALL THE TEAM

10      MEMBERS AWARE.  AND IF WHOEVER IS FREE, NORMALLY

11      HEADS THAT DIRECTION.  THAT'S WHAT HAPPENED IN

12      THIS CASE.  I WAS FREE, SO I RESPONDED TO HIM.

13  Q.   DO YOU REMEMBER WHERE YOU WERE WHEN YOU RECEIVED

14      THAT CALL FROM HIM?

15  A.   NO, SIR.  I COULD TELL YOU THAT I WAS SOMEWHERE

16      ON THE INTERSTATE, BUT I DON'T KNOW EXACTLY

17      WHERE.

18  Q.   DO YOU RECALL ABOUT HOW LONG IT TOOK FOR YOU TO

19      GET THERE?

20  A.   IT USUALLY TAKES ME -- OUR AVERAGE RESPONSE TIME

21      IS USUALLY FOUR OR FIVE MINUTES TO ANYBODY

22      ANYWHERE ON THE INTERSTATE.  BETWEEN WHERE HE WAS

23      WORKING, BEING HE WAS ON 12, I WOULD HAVE BEEN

24      SOMEWHERE BETWEEN THE SPLIT AND THE AMITE RIVER.

25      WE -- IF WE'RE GOING TO WORK THAT AREA, WE'RE

1         GOING TO WORK IT ALL TOGETHER.

2   Q.   SO ONCE YOU ARRIVED ON THE SCENE, WERE THERE ANY

3         OTHER OFFICERS THERE OTHER THAN OFFICER JENKINS?

4   A.   YES, SIR.  OFFICER BRAD BICKHAM WAS THERE.

5   Q.   AND WHAT DID YOU SEE WHEN YOU FIRST ARRIVED?

6   A.   I SAW OFFICER BRAD BICKHAM STANDING NEXT TO MR.

7         BURCHAM IN FRONT OF OFFICER JENKINS' POLICE UNIT.

8         OFFICER JENKINS, LIKE I SAID, WAS SEARCHING THE

9         VEHICLE.

10  Q.   OKAY.  WHAT, IF ANYTHING, DID YOU DO ONCE YOU

11        ARRIVED?

12  A.   I PROCEEDED TO HELP AND I ASSISTED IN SEARCH THE

13        VEHICLE.

14  Q.   AND ARE YOU A CANINE HANDLER?

15  A.   YES, SIR.

16  Q.   DID YOU USE YOUR CANINE ON THIS INSTANCE?

17  A.   NO, SIR.

18  Q.   WHY NOT?

19  A.   HE WAS ALREADY SEARCHING THE VEHICLE.  I LIKE TO

20        -- USUALLY IF I -- IF I'M GOING TO USE THE

21        CANINE, IT'S AT THE BEGINNING OF A SEARCH BEFORE

22        ANYBODY HAS TOUCHED IT.

23  Q.   SO, YOU WENT AHEAD AND YOU STARTED SEARCHING WITH

24        OFFICER JENKINS?

25  A.   YES, SIR.

1   Q.   OKAY.  AND WHAT TYPE OF THINGS ARE YOU LOOKING

2        FOR?

3   A.   I'M GOING TO BACK UP A LITTLE BIT, JUST SO I CAN

4        CLARIFY SOMETHING.

5   Q.   OKAY.

6   A.   WE DIDN'T USE THE CANINE AT THE BEGINNING OF THIS

7        SEARCH.  AT THE END, AFTER THE COMPARTMENT WAS

8        LOCATED, THE CANINE WAS USED.

9   Q.   OKAY.  ALL RIGHT.  SO, ONCE YOU STARTED YOUR

10       SEARCH WHAT WERE YOU LOOKING FOR?

11  A.   BASICALLY WHAT I JUST DESCRIBED.  I'M LOOKING FOR

12       ANY ABNORMALITIES IN THE VEHICLE, AS FAR AS ANY

13       PANEL THAT MIGHT HAVE RECENTLY BEEN REMOVED, ANY

14       NUTS, ANY BOLTS THAT LOOK LIKE THEY HAVE RECENTLY

15       BEEN REMOVED, ANY KIND OF AFTER-MARKET WHEELS ON

16       THE VEHICLE, THOSE TYPE OF THINGS.

17  Q.   AND DID YOU NOTICE ANY OF THAT WHEN YOU WERE

18       CONDUCTING THE SEARCH?

19  A.   YES, SIR.

20  Q.   WHAT DID YOU NOTICE?

21  A.   THE FIRST THING I SAW WAS ON THE REAR DRIVER'S

22       SIDE TIRE -- NOT THE TIRE, BEHIND THE TIRE ON THE

23       FENDER WELL, THE REAR FENDER WELL, THERE WAS

24       SEVERAL TORX BOLTS THAT HOLD THE BUMPER COVER IN

25       PLACE.  THE REAR FENDER CONNECTS TO THE BUMPER

1    COVER AT THAT SPOT.  I NOTICED THAT ALL OF THESE

2    BOLTS, THEY WERE BLACK -- BLACK BOLTS, BUT THE

3    INSIDE OF THEM HAD -- BASICALLY, THERE WAS A

4    SHINY METAL EXPOSED, TELLING ME THAT THEY HAD

5    RECENTLY BEEN REMOVED OR PUT ON.  I KNEW IT WAS A

6    NEWER VEHICLE.  AND UNLESS IT HAD BEEN WRECKED, I

7    THOUGHT THAT WAS -- IT SHOULDN'T HAVE BEEN

8    REMOVED.  THAT'S NOT A COMMON THING TO BE

9    REMOVED.

10        SO, WHEN I SAW THAT, THE FIRST THING THAT

11   CAME TO MY MIND WAS THAT IF IT WAS THERE, IT WAS

12   POSSIBLY CONCEALED IN THE BUMPER.  BECAUSE THE

13   BUMPER COVER WOULD HAVE TO HAVE BEEN REMOVED FOR

14   THAT CONCEALMENT.

15        AT THAT TIME I WENT AND I LAID UNDERNEATH

16   THE REAR OF THE CAR, UNDERNEATH THE BUMPER, AND I

17   LOOKED UP.  AND WHEN I DID, I SAW AFTER-MARKET

18   WELDS ON THE BUMPER.  IT WAS AN ALUMINUM.  I SAW

19   90-DEGREE WELDS ON THE BUMPER, WHICH I DESCRIBED

20   TO YOU EARLIER IS NOT A COMMON -- A COMMON THING

21   TO HAVE A 90-DEGREE WELD.  IN FACT, IT'S -- I

22   DON'T THINK I'VE EVER SEEN A 90-DEGREE WELD ON

23   ANY KIND OF FACTORY BUMPER.  AND THAT'S WHAT I

24   SAW.

25        SO, I PRETTY MUCH IMMEDIATELY KNEW THAT

1        THERE WAS AN AFTER-MARKET COMPARTMENT HERE.

2   Q.   OKAY.  SO, WHAT, IF ANYTHING, DID YOU DO NEXT?

3   A.   I NOTIFIED OFFICER JENKINS.  AND I BELIEVE AT

4        THAT TIME WE DETAINED MR. BURCHAM.

5   Q.   OKAY.  AND WHERE WAS MR. BURCHAM?  COULD YOU SEE

6        HIM FROM WHERE YOU WERE DOING THE SEARCH?

7   A.   YES, SIR.  HE WAS STANDING AT THE FRONT OF

8        OFFICER JENKINS' CAR, WHICH WAS ABOUT TEN FEET

9        FROM ME.

10  Q.   OKAY.  AND WHERE WAS OFFICER JENKINS' CAR IN

11       RELATION TO MR. BURCHAM'S VEHICLE?

12  A.   DIRECTLY BEHIND IT.

13  Q.   OKAY.  SO, HE WAS STANDING IN FRONT OF OFFICER

14       JENKINS' CAR AND BEHIND HIS VEHICLE?

15  A.   YES, SIR.

16  Q.   OKAY.  SO, YOU SAID THAT HE WAS DETAINED?

17  A.   YES, SIR.

18  Q.   AND WHAT DO YOU MEAN BY THAT?

19  A.   HE WAS PLACED IN HANDCUFFS.  HE WAS ALSO ADVISED

20       OF HIS RIGHTS PER MIRANDA.

21  Q.   OKAY.  SO, WAS HE NOT DETAINED BEFORE THAT?

22  A.   NO, SIR.

23  Q.   OKAY.  WHAT DOES IT MEAN TO BE DETAINED, TO YOU?

24  A.   THAT HE'S NO LONGER FREE TO LEAVE.

25  Q.   SO, UP UNTIL THAT POINT HE WAS FREE TO LEAVE?

 1   A.   YES, SIR.

 2   Q.   DID ANYBODY TELL HIM HE WAS FREE TO LEAVE?

 3   A.   NOT THAT I RECALL.  BUT IT WAS A CONSENSUAL

 4        SEARCH.  AT ANY TIME HE COULD HAVE TOLD US THAT,

 5        "I DON'T WANT YOU SEARCHING MY VEHICLE," AND WE

 6        WOULD HAVE TERMINATED THE SEARCH.  AND EITHER WE

 7        WOULD USE THE CANINE OR HE WOULD HAVE LEFT OR ONE

 8        OF THE OTHER.  BUT, NO.

 9   Q.   OKAY.  ALL RIGHT.  SO, WHY DID YOU ALL DETAIN HIM

10        THEN?

11   A.   WELL, AT THIS POINT I WAS LIKE -- I CAN'T SAY 100

12        PERCENT, BUT I WAS VERY CONFIDENT THAT THERE WAS

13        AN AFTER-MARKET COMPARTMENT HERE.  I WAS ALSO

14        VERY CONFIDENT THAT MR. BURCHAM SAW ME MAKING

15        THESE OBSERVATIONS.  I WAS LAYING ON MY BACK,

16        LOOKING STRAIGHT UP AT IT.

17             IN FACT, I BELIEVE, ACTUALLY BEFORE WE

18        DETAINED MR. BURCHAM -- WELL, I'M NOT GOING TO

19        SAY.  I CAN'T RECALL.  OFFICER JENKINS HAD CAME

20        AND LAID DOWN ALSO, BEFORE AND AFTER MR. BURCHAM

21        WAS DETAINED.  BUT EITHER WAY, IT WAS OBVIOUS

22        THAT I LOCATED THE COMPARTMENT.  ANYBODY WHO KNEW

23        THE COMPARTMENT WAS THERE, IF THEY'RE WATCHING

24        ME, THEY WOULD HAVE SEEN THAT I HAD JUST FOUND

25        IT.

1      AND A LOT OF TIMES ON OUR JOBS WE'LL HAVE

2    INDIVIDUALS SMUGGLING NARCOTICS OR ANY

3    CONTRABAND, AND UP UNTIL THE POINT OF THE

4    LOCATION OF THE CONTRABAND, THEY'LL ACT COOL,

5    CALM, COLLECTED.  THEY'LL GIVE CONSENT.  THEY'LL

6    BE 100 PERCENT COOPERATIVE, HOPING THAT THEIR

7    HIDING SPOT IS GOOD ENOUGH FOR YOU NOT TO FIND

8    IT.

9      NOW, ONCE WE LOCATE THE NARCOTICS OR THE

10   CONTRABAND, WHATEVER IT IS, A LOT OF TIMES THAT

11   ATTITUDE -- I MEAN, IT'S -- I GUESS THE BEST WAY

12   TO DESCRIBE IT IS WE KNOW THEY GET A SPIKE IN

13   ADRENALIN.  I CAN'T SAY THAT FOR CERTAIN BECAUSE

14   THERE'S NO STUDIES THAT I KNOW OF THERE.  BUT I

15   CAN TELL YOU THAT I'VE SEEN ACTION.  THAT'S WHEN

16   ACTION HAPPENS.  THAT'S WHEN IT HAPPENS, WHENEVER

17   YOU LOCATE IT.

18     WHEN THEY REALIZE, ALL RIGHT, THE GAME IS UP.

19   THEY FOUND IT.  THERE'S NO MORE ACTING COOL;  I

20   GOT TO DO SOMETHING.  AND AT THAT TIME, IS A LOT

21   OF TIMES WHEN YOU WILL HAVE THE SUSPECTS FLEE.

22   YOU'LL HAVE THEM FIGHT THE OFFICERS.  MAKE SOME

23   KIND OF IRRATIONAL DECISION.  THERE'S A SPECIFIC

24   CASE IN THIS DISTRICT WHERE AS SOON AS THE

25   CONTRABAND WAS FOUND, THE DRIVER RAN INTO TRAFFIC

1       AND PURPOSEFULLY COMMITTED SUICIDE.

2            SO, ALL THESE THINGS -- YOU KNOW, ANYTHING

3       CAN HAPPEN ONCE THAT HAPPENS.  SO, FOR THEIR

4       SAFETY AND OUR SAFETY, WE'RE GOING TO IMMEDIATELY

5       DETAIN THEM SO THAT NONE OF THIS HAPPENS.

6    Q.  OKAY.  SO, ONCE HE WAS DETAINED WHAT, IF

7       ANYTHING, HAPPENED NEXT?

8    A.  WE WENT TO THE TRUNK AND I POPPED -- THERE'S A

9       PANEL RIGHT THERE.  I REMOVED THE PANEL TO EXPOSE

10      A DRAIN HOLE COVER.  AND THERE'S A COMMON

11      LOCATION FOR THAT.  THE DRAIN HOLE COVER IS

12      COVERED WITH A RUBBER GROMMET. I REMOVED THIS

13      RUBBER GROMMET.  AND FROM THAT RUBBER GROMMET

14      BEING REMOVED, IT SHOULD BE EMPTY.  IT SHOULD BE

15      -- YOU SHOULD BASICALLY BE ABLE TO SEE OUTSIDE

16      THE VEHICLE.  THAT'S THE PURPOSE OF THE DRAIN

17      HOLE.  WELL, YOU COULDN'T.  IT WAS BLOCKED BY

18      THIS AFTER-MARKET ALUMINUM METAL.

19           SO, TO ME, THAT JUST CONFIRMED THAT THERE IS

20      AN AFTER-MARKET COMPARTMENT HERE, WITHOUT A

21      DOUBT.  SO, NOW, WE HAVE TO REMOVE THE REAR

22      BUMPER COVER.

23   Q.  OKAY.  SO, WHAT DID YOU ALL DO NEXT?

24   A.  WE TRANSPORTED MR. BURCHAM AND THE VEHICLE TO THE

25      BATON ROUGE DEA OFFICE.

1   Q.   ONCE WE ARRIVED THERE, I USUALLY DRILL WITH A

2        DRILL BIT.  I CAN'T REMEMBER THE EXACT SIZE.  BUT

3        I DRILLED THROUGH THAT ALUMINUM THAT I SAW ON THE

4        DRAIN HOLE.  AND JUST WHERE THE DRAIN HOLE IS, I

5        DRILLED THOUGH THAT AFTER-MARKET ALUMINUM.  WHEN

6        I DID, I PULLED THE DRILL BIT OUT AND THERE WAS A

7        WHITE POWDER SUBSTANCE ON IT.  SUSPECTED IT TO BE

8        COCAINE.  SO, WE USED A NIK FIELD SWAB AND TESTED

9        THE WHITE POWDER SUBSTANCE, AND IT TESTED

10       POSITIVE FOR COCAINE.

11  Q.   NOW, WHY DID YOU TRANSFER MR. BURCHAM AND THE

12       VEHICLE BACK TO THE DEA OFFICE?  WHY DIDN'T YOU

13       JUST TAKE IT APART OUT THERE ON THE SIDE OF THE

14       ROAD?

15  A.   AGAIN, FOR SAFETY REASONS.  WE DON'T LIKE -- IF

16       IT -- IF WE'RE HAVING TO TAKE MAJOR PARTS OFF OF

17       A VEHICLE, WE'RE NOT GOING TO DO IT ON THE SIDE

18       OF THE INTERSTATE WITH TRAFFIC LIKE IT IS.  IT'S

19       JUST -- IT'S TOO DANGEROUS.

20  Q.   AND, CORPORAL COWART, WERE THERE ANY PHOTOGRAPHS

21       TAKEN OF THE VEHICLE?

22  A.   YES, SIR.

23  Q.   LET ME SHOW YOU WHAT'S BEEN PREVIOUSLY MARKED AS

24       "UNITED STATES EXHIBIT 1" FOR IDENTIFICATION.

25       THIS IS SIX PAGES.  DO YOU RECOGNIZE THIS FIRST

1        PAGE?

2   A.   YES, SIR.

3   Q.   OKAY.  AND WHAT'S ON THIS FIRST PAGE HERE?

4   A.   THAT IS THREE PHOTOGRAPHS OF THE VEHICLE IN

5        QUESTION.

6   Q.   OKAY.  NOW, I NOTICE THERE'S SOME WRITING AT THE

7        TOP OF THE PAGE.  HOW DID THAT GET THERE?

8   A.   I ACTUALLY -- THIS IS A -- THESE PHOTOGRAPHS WERE

9        FROM A SLIDE PRESENTATION OF A SYNOPSIS THAT I

10       DID ON THIS CASE FOR OFFICER JENKINS.  AND I

11       TYPED THAT -- THOSE DETAILS IN THE TOP.

12  Q.   OKAY.  SO, OTHER THAN THE TYPING AT THE TOP OF

13       THAT PAGE, HAVE THESE PHOTOGRAPHS BEEN EDITED IN

14       ANY WAY?

15  A.   NO, SIR.

16  Q.   OKAY.  AND DO THEY ACCURATELY DEPICT THE VEHICLE

17       AT THE TIME THAT THIS INCIDENT OCCURRED?

18  A.   YES, SIR.

19  Q.   WE'LL MOVE TO PAGE TWO.  WHAT IS THAT?

20  A.   THAT IS A PHOTO OF THE REAR FENDER AREA OF THE --

21       ON THE DRIVER'S SIDE.  THE TWO ARROWS ARE

22       POINTING AT THE TORX BOLTS I DESCRIBED.  IT'S

23       KIND OF HARD TO SEE AT THE BOTTOM ONE, BUT THE

24       TOP ONE YOU CAN REALLY SEE.  IT'S A BLACK TORX

25       BOLT IN THE CENTER OF IT.  THERE'S MORE OF A

1       SHINY METAL -- INDICATING THERE HAD BEEN TOOLING.

2       AND THAT -- THAT'S WHAT THE PURPOSE OF THIS

3       PHOTOGRAPH WAS, IS TO SHOW THE TOOLING ON THIS

4       TORX BOLT.

5    Q.  OKAY.  SO, WHEN YOU USE THAT TERM, "TOOLING,"

6       YOU'RE REFERRING TO THAT MARK IN THE CENTER OF

7       THE BOLT THERE WHERE THAT TOP ARROW IS POINTED?

8    A.  YES.  WHEN I REFER TO "TOOLING," I'M REFERRING TO

9       DUST DETERMINE -- DUST DISTURBANCE ON A NUT OR A

10      BOLT OR METAL SHAVINGS OR FRESH METAL BEING

11      VISIBLE.

12   Q.  OKAY.  NOW, OTHER THAN THE TYPED WORDS HERE AND

13      THE ARROWS, HAS THIS PHOTOGRAPH BEEN EDITED IN

14      ANY WAY?

15   A.  NO, SIR.

16   Q.  OKAY.  AND IT ACCURATELY DEPICTS THE SUBJECT

17      MATTER CONTAINED THEREIN?

18   A.  YES, SIR.

19   Q.  MOVING TO PAGE THREE.  DO YOU RECOGNIZE THIS

20      PHOTO?

21   A.  YES, SIR.

22   Q.  AND WHAT IS THIS?

23   A.  THIS WAS THE VIEW THAT I INITIALLY GOT WHEN I

24      LAID DOWN UNDER THE VEHICLE.  THE ARROW WITH ONE

25      OF THE -- WELL, THE ONLY ARROW THAT YOU SEE ON

1        THERE IS POINTING TO THIS 90-DEGREE WELD THAT I

2        INITIALLY SAW.  AND THAT'S WHAT IT IS.

3   Q.   OKAY.  AND THIS PHOTOGRAPH ALSO HAS TYPING ON

4        THERE AND ARROWS DRAWN.  OTHER THAN THE TYPING

5        AND THE ARROWS, HAS IT BEEN EDITED IN ANY WAY?

6   A.   NO, SIR.

7   Q.   DOES IT ACCURATELY REFLECT THE SUBJECT MATTER

8        CONTAINED THEREIN?

9   A.   YES, SIR.

10  Q.   MOVING TO PAGE FOUR.  DO YOU RECOGNIZE THIS

11       PHOTO?

12  A.   YES, SIR.

13  Q.   WHAT IS THIS?

14  A.   THIS IS THE PHOTO OF THE INSIDE OF THE TRUNK.

15       YOU'RE LOOKING AT -- YOU'RE LOOKING FROM INSIDE

16       THE TRUNK TOWARDS THE REAR TRUNK WALL.  THE

17       PLASTIC PANEL HAS BEEN REMOVED FROM THAT WALL AND

18       WE'RE -- THERE'S AN ARROW POINTING TO A HOLE THAT

19       SAYS -- THAT'S LABELED AS "DRILL HOLE."  RIGHT

20       THERE IS WHERE THE RUBBER GROMMET WAS COVERING

21       THE DRAIN HOLE WHERE THIS -- THIS IS THE AREA

22       THAT I WAS DESCRIBING THAT SHOULD HAVE BEEN

23       OPENED AND IT WAS NOT.  YOU CAN SEE THERE THAT

24       IT'S BLOCKED BY AFTER-MARKET METAL.

25            AND YOU CAN FURTHER SEE THAT THERE'S A

1       SMALLER HOLE DRILLED IN THE MIDDLE THERE. THAT'S

2       WHERE I USED MY DRILL BIT TO DRILL A HOLE

3       THROUGH.  AND ON THE BOTTOM YOU CAN SEE WHEN I

4       PULLED MY DRILL BIT OUT, THE COCAINE -- THE

5       POWDER COCAINE WAS ON THE BOTTOM OF THE TRUNK.

6   Q.  OKAY.  SO, OTHER THAN THE TYPING ON HERE AND THE

7       ARROWS, IS THIS -- HAVE THESE PHOTOGRAPHS BEEN

8       EDITED IN ANY WAY?

9   A.  NO, SIR.

10  Q.  AND DO THEY ACCURATELY DEPICT THE SUBJECT MATTER

11      CONTAINED THEREIN?

12  A.  YES, SIR.

13  Q.  MOVING ON TO PAGE FIVE.  DO YOU RECOGNIZE THESE

14      PHOTOS?

15  A.  YES, SIR.

16  Q.  AND WHAT ARE THEY?

17  A.  THIS IS A PHOTO OF THE REAR OF THE VEHICLE AFTER

18      THE BUMPER COVER HAD BEEN REMOVED.

19  Q.  OKAY.

20  A.  AND IT'S SHOWING THE OPEN TOP END COMPARTMENT

21      WITH THE 12 KILOS OF COCAINE IN IT.

22  Q.  IS THAT THE PHOTO ON THE LEFT, THE PICTURE OF THE

23      COCAINE?

24  A.  YES, SIR.  BOTH OF THEM HAVE COCAINE IN THEM.

25  Q.  ALL RIGHT.  AND OTHER THAN THE TYPING ON THIS

1          PHOTO, HAVE THESE PHOTOS BEEN EDITED IN ANY WAY?

2    A.    NO, SIR.

3    Q.    DO THEY ACCURATELY DEPICT THE SUBJECT MATTER

4          CONTAINED THEREIN?

5    A.    YES, SIR.

6    Q.    MOVING ON TO THE LAST PAGE, PAGE SIX.  DO YOU

7          RECOGNIZE THESE PHOTOS?

8    A.    YES, SIR.

9    Q.    AND WHAT IS -- WHAT IS THIS?

10   A.    THE PICTURE ON THE LEFT IS PRETTY MUCH THE SAME

11         PICTURE EXCEPT FOR THE TRUNK HAS BEEN CLOSED AND

12         THE COCAINE HAS BEEN REMOVED FORM THE

13         COMPARTMENT, AND IT'S BEEN STACKED ON THE REAR OF

14         THE TRUNK.  THAT WAS ALL OF THE COCAINE LOCATED

15         IN THE COMPARTMENT.  AND THE PICTURE ON THE RIGHT

16         IS A PICTURE OF MR. BURCHAM THAT WE TOOK THAT

17         NIGHT.

18   Q.    OKAY.  AND OTHER THAN THE TYPING ON THIS PAGE,

19         HAVE THESE PHOTOS BEEN EDITED IN ANY WAY?

20   A.    NO, SIR.

21   Q.    DO THEY ACCURATELY DEPICT THE SUBJECT MATTER

22         CONTAINED THEREIN?

23   A.    YES, SIR.

24              MR. FLOWERS: YOUR HONOR, AT THIS TIME

25                  THE GOVERNMENT MOVES TO ADMIT "UNITED

1          STATES EXHIBIT 1" FOR IDENTIFICATION INTO

2          EVIDENCE, "UNITED STATES EXHIBIT 1."

3          THE COURT: ANY OBJECTION?

4          MR. DIGIULIO: NO OBJECTION.

5          THE COURT: WITHOUT OBJECTION, THE

6             "GOVERNMENT'S EXHIBIT 1" IN GLOBO

7          EXHIBIT IS ADMITTED.

8          MR. FLOWERS: THANK YOU, YOUR HONOR.

9   MR. FLOWERS:

10  Q.   ALL RIGHT.  SO ONCE YOU ALL FOUND THE INDIVIDUAL

11       PACKAGES OF WHAT YOU SUSPECTED TO BE COCAINE IN

12       THE BUMPER WHAT, IF ANYTHING, DID YOU DO NEXT?

13  A.   THAT PART I WASN'T REALLY INVOLVED IN.  SO, I

14       COULDN'T REALLY TELL YOU.  I MEAN, WE -- I HELPED

15       THEM MOVE THE COCAINE AND ALL UP TO OUR OFFICE.

16       BUT A LOT OF -- I DIDN'T HAVE A LOT OF

17       INVOLVEMENT AFTER THAT.  I ACTUALLY WAS WORKING

18       ON THIS SYNOPSIS ONCE EVERYTHING WAS WRAPPED UP.

19          WE DID -- ONE THING THAT I DID DO WAS I

20       REINSTALLED THE BUMPER COVER BACK ON THE VEHICLE

21       AFTER THE COCAINE HAD BEEN REMOVED.

22  Q.   OKAY.

23          MR. FLOWERS: THOSE ARE ALL THE QUESTIONS

24             I HAVE AT THIS TIME, YOUR HONOR.

25          THE COURT: ANY CROSS EXAMINATION?

1              AND, BY THE WAY, MR. DIGIULIO, I HAVE TO

2         MENTION -- WELL, I'LL MENTION AFTER YOU

3         COMPLETE YOUR CROSS EXAMINATION.

4                   CROSS EXAMINATION

5    MR. DIGIULIO:

6    Q.   CORPORAL COWART, JOHN DIGIULIO, REPRESENTING

7         JESSE BURCHAM.

8    A.   YES, SIR.

9    Q.   ALL RIGHT.  DID YOU GET A SUBPOENA FROM ME ABOUT

10        THE -- ASKING FOR LOGS AND COMMUNICATIONS AND

11        VIDEO?

12   A.   NO, SIR.  NOT THAT I RECALL.

13   Q.   YOU NEVER GOT THAT SUBPOENA?

14   A.   NO, SIR.

15   Q.   THE SUBPOENA WAS ISSUED A MONTH AND A HALF AGO.

16        AND, IN FACT, IT WAS ISSUED FOR THE DATE WHEN

17        THIS HEARING WAS ORIGINALLY SET BUT IT WAS RIGHT

18        AFTER THE BUSINESS IN BATON ROUGE THAT TOOK YOU

19        OUT OF COMMISSION FOR A WHILE.

20   A.   YES, SIR.

21   Q.   THE SHOOTING.  BUT YOU NEVER GOT THAT SUBPOENA?

22   A.   NOT THAT I RECALL, SIR.

23   Q.   NOW, THE -- APPARENTLY THERE ARE NO LOGS OF

24        HIGHWAY STOPS BY YOUR UNIT?

25   A.   NO, SIR.

USA VS. JESSE A. BURCHAM, SUPPRESSION HEARING, 8-8-16  79

1   Q.   AND THERE ARE NO COMMUNICATIONS THAT ARE RECORDED

2        OR EITHER ELECTRONICALLY OR IN WRITING OF THE

3        COMMUNICATIONS BETWEEN YOUR TEAM MEMBERS?

4   A.   NO, SIR.

5   Q.   AND, BASICALLY, IS IT FAIR TO SAY THERE REALLY --

6        THERE ARE PROBABLY TWO KINDS OF, AT LEAST, OF

7        THESE HIGHWAY STOPS.  ONE OF THEM IS IF YOU HAVE

8        A TIP ABOUT A PARTICULAR TRANSPORTATION GOING ON,

9        CORRECT?

10  A.   YES, SIR.

11  Q.   AND THE OTHERS ARE PRETTY MUCH RANDOM BASED ON

12       ---

13  A.   CORRECT.

14  Q.   AND THIS WAS A RANDOM.  YOU DIDN'T HAVE ANY KIND

15       OF INFORMATION ABOUT JESSE BURCHAM, CORRECT?

16  A.   NO, SIR.  WE DID NOT.

17  Q.   ALL RIGHT.  NOW, YOU -- DID YOU -- WHAT WAS YOUR

18       PARTICIPATION IN THE HANDCUFFING OF MR. BURCHAM

19       AT THE SIDE OF THE ROAD?  WAS IT DONE BY YOU OR

20       WAS IT DONE BY ---

21  A.   NO, SIR.  I BELIEVE -- I BELIEVE OFFICER JENKINS

22       HANDCUFFED MR. BURCHAM.  I KNOW I WAS RIGHT THERE

23       WITH HIM WHEN HE DID IT.  I DON'T BELIEVE I

24       HANDCUFFED HIM.  I THINK I WAS RIGHT -- WE BOTH

25       APPROACHED MR. BURCHAM TOGETHER, AND OFFICER

1        JENKINS ACTUALLY PUT THE HANDCUFFS ON HIM.

2   Q.   AND WHO READ HIM HIS MIRANDA RIGHTS?

3   A.   THAT, I WOULD HAVE TO REVIEW THE REPORT TO

4        REFRESH MY MEMORY ON THAT.  I DON'T RECALL.

5   Q.   OKAY.  IF OFFICER JENKINS SAID HE DID, YOU

6        WOULDN'T HAVE A ---

7   A.   NO, SIR.  I WOULDN'T.

8   Q.   NOW, -- AND YOU HAD -- HOW MUCH TIME THEN, IF YOU

9        KNOW, WENT BY BETWEEN THE TIME OF THE -- OF YOUR

10       ARRIVING ON THE SCENE AND THE PLACING OF THE

11       HANDCUFFS?

12  A.   IT WASN'T LONG AT ALL.  I -- I FOUND IT VERY

13       QUICKLY.  I WOULD SAY MAYBE FIVE MINUTES.

14  Q.   AND HOW LONG BETWEEN THE TIME YOU PLACED THE

15       HANDCUFFS UNTIL THE SEARCH AT DEA HEADQUARTERS?

16  A.   THAT WOULD BE HARD TO GIVE YOU A NUMBER THERE.

17       THIRTY, 45 MINUTES.  BUT I'M JUST -- I'M REALLY

18       GUESSING.

19  Q.   OKAY.  NOW, HAVE YOU HAD -- IN YOUR TRAINING,

20       HAVE THEY -- HAVE YOU HAD SOMEONE DISTINGUISH

21       BETWEEN DETAINING BY PLACING IN HANDCUFFS AND

22       READING RIGHTS, AND ARRESTING BY PLACING

23       HANDCUFFS AND READING RIGHTS?

24  A.   NO.  I DON'T BELIEVE I UNDERSTAND YOUR QUESTION.

25       CAN YOU ---

1  Q.  HAS -- WHERE -- WHAT IS THE BASIS, I GUESS, IF

2      IT'S IN YOUR TRAINING, FOR DISTINGUISHING BETWEEN

3      PUTTING SOME HANDCUFFS ON SOMEBODY, READING THEIR

4      RIGHTS, BUT NOT CALLING THAT AN ARREST?

5  A.  OKAY.  FOR US TO DETAIN SOMEBODY, WE HAVE TO HAVE

6      REASONABLE SUSPICION THAT A CRIME WAS BEING

7      COMMITTED.  FOR US TO HANDCUFF SOMEBODY, THAT'S

8      -- I MEAN, WE HAVE BEEN TRAINED THAT IF IT'S FOR

9      OFFICER SAFETY THAT WE CAN HANDCUFF SOMEBODY WHEN

10     YOU'RE REFERRING TO A DETENTION.  AND THAT'S WHAT

11     HAPPENED HERE.  WE HAD REASONABLE SUSPICION THAT

12     MR. BURCHAM WAS INVOLVED IN A CRIMINAL ACTIVITY.

13     AND FOR OUR SAFETY WE PLACED HIM IN HANDCUFFS.

14 Q.  THE REASONABLE SUSPICION WAS BECAUSE YOU

15     SUSPECTED THE AFTER-MARKET CONTAINER?

16 A.  YES.  AND I WOULD -- I WOULD -- AS I STATED

17     EARLIER, I'LL -- AFTER -- ONCE I FOUND IT, I WAS

18     -- I RECALL MORE OF A SUSPICION ON MY PART.  I

19     MEAN, I -- I WAS CONFIDENT IT WAS THERE.

20 Q.  BUT YOU DIDN'T KNOW WHAT WAS IN IT?

21 A.  CORRECT.

22 Q.  AND THERE WERE NO DRUGS AT THE TIME THAT THE

23     HANDCUFFS WERE -- THAT YOU KNEW ABOUT AT THE TIME

24     THE HANDCUFFS WERE PLACED ON MR. BURCHAM?

25 A.  CORRECT.

1  Q.  CORRECT.  DID YOU WRITE A REPORT --

2  A.  NO, SIR.

3  Q.  -- IN THIS CASE?  OKAY.  YOU ORDINARILY DON'T

4      WRITE A REPORT?

5  A.  USUALLY THE PRIMARY OFFICER COVERS ALL THE

6      ACTIONS IN HIS REPORT UNLESS IT WAS SOMETHING

7      SIGNIFICANT THAT ANOTHER OFFICER DID THAT THE

8      PRIMARY OFFICER WAS NOT PRESENT FOR.

9  Q.  AND YOU SAID YOU USED YOUR DOG?

10 A.  YES, SIR.

11 Q.  LATER ON.  DID YOU WRITE ANY KIND OF NOTES OR

12     REPORT ON WHAT THE DOG'S ACTIVITY WAS, WHO THE

13     DOG WAS?

14 A.  NO, SIR.  I DIDN'T.  BECAUSE THIS IS NORMALLY

15     COVERED BY THE PRIMARY OFFICER.  THE PRIMARY

16     OFFICER ISN'T A CANINE HANDLER, SO I GUESS HE

17     DIDN'T FIND THE NEED TO.

18         MY DOG DID NOT SHOW AN ALERT TO THE VEHICLE

19     WHEN I RAN HER.  SHE -- SHE DIDN'T ALERT ON IT.

20     AND I THINK BECAUSE OF THAT REASON IT WASN'T

21     SIGNIFICANT TO OFFICER JENKINS, SO HE DIDN'T

22     WRITE A REPORT.

23 Q.  OKAY.  SO, THE DOG NOT ALERTING INDICATED THAT

24     THE DOG DIDN'T DETECT ANY DRUGS, CORRECT?

25 A.  IT INDICATED THAT THE DOG DIDN'T SMELL THE ODOR

1     OF THE NARCOTICS.

2 Q.   OKAY.  AND THAT WAS DONE -- WAS MR. BURCHAM IN

3     HANDCUFFS AT THE TIME THE DOG WAS RUN?

4 A.   YES, SIR.  I DID THAT -- WELL, I'LL BE HONEST.  I

5     DID THIS MORE OUT OF CURIOSITY IF MY DOG WOULD

6     ALERT.  THIS WAS DONE RIGHT BEFORE WE LEFT THE

7     AREA AND HEADED TOWARDS THE DEA OFFICE.

8 Q.   OKAY.

9     MR. DIGIULIO: THAT'S ALL I HAVE, JUDGE.

10     THE COURT: ANY REDIRECT?

11     MR. FLOWERS: NO, YOUR HONOR.

12     THE COURT: WHAT I WAS GOING TO MENTION,

13     MR. DIGIULIO, THAT I'VE IMPLEMENTED NOW

14     WHAT I CALL THE DIGIULIO RULE HERE OR THE

15     DIGIULIO PRIVILEGE.  THAT IS, THAT YOU -- I

16     KNOW YOU HAVE SOME BAD KNEES THERE, SO YOU

17     DON'T HAVE TO NECESSARILY STAND AS YOU WOULD

18     OTHERWISE DO.  AND I WAS GOING TO TELL YOU

19     THAT IF YOU WERE MORE COMFORTABLE JUST -- ARE

20     YOU OKAY WITH THOSE KNEES?

21     MR. DIGIULIO: I'M FINE, JUDGE.

22     THE COURT: ALL RIGHT.

23     MR. DIGIULIO: THE TITANIUM ONE WORKS BETTER

24     THAN THE OTHER ONE, BUT IT WORKS REAL

25     WELL.

1      THE COURT: OKAY.  ALL RIGHT.  BECAUSE I SEE
2          YOU'RE GETTING ALONG THERE.  I KNOW,
3      AGAIN, THOSE KNEES ---
4      MR. DIGIULIO: IT'S ALSO HARDER TO SEE FROM
5          BACK THERE ANYWAY.  SO, I APPRECIATE
6      THAT. THANK YOU, JUDGE.
7      THE COURT: YES.  OKAY.  CORPORAL COWART,
8          WELCOME AGAIN.
9      THE WITNESS: THANK YOU, YOUR HONOR.
10     THE COURT: I SAY THAT BECAUSE THE CORPORAL
11         WAS A WITNESS IN A RECENT TRIAL HERE IN
12     MY COURT.
13         SO, AGAIN, WERE YOU PRESENT WHEN CONSENT
14     WAS REQUESTED TO SEARCH THE VEHICLE?
15     THE WITNESS: NO, SIR.
16     THE COURT: ALL RIGHT.  SO, YOU DON'T KNOW
17         WHAT WAS ASKED OF THE DEFENDANT AT THAT
18     TIME?
19     THE WITNESS: NO, SIR.  I DO NOT.
20     THE COURT: LET'S TALK JUST FOR A MINUTE.
21         I DON'T HAVE A WHOLE LOT OF QUESTIONS,
22     BUT JUST ABOUT YOUR USE OF THE CANINE.
23     YOU'VE TESTIFIED THAT YOU DECIDED TO USE THE
24     CANINE AFTER THE DECISION WAS MADE TO REMOVE
25     THE VEHICLE TO THE DEA OFFICE, CORRECT?

1       THE WITNESS: CORRECT.

2       THE COURT: SO, WERE THE OTHER OFFICERS

3            PRESENT AT THAT TIME?

4       THE WITNESS: OFFICER JENKINS, I BELIEVE,

5            WAS PRESENT.  I CAN'T -- AND THE ONLY

6       REASON WHY I'M QUESTIONING THIS IS BECAUSE,

7       LIKE I SAID, THIS WAS RIGHT BEFORE WE LEFT TO

8       GO BACK TO DEA.  SO, I CAN'T REMEMBER IF ANY

9       OF THOSE OFFICERS OR OFFICER BICKHAM, FOR

10      INSTANCE, HAD ALREADY LEFT.  BUT I BELIEVE

11      OFFICER JENKINS AND OFFICER BICKHAM WERE

12      THERE.

13      THE COURT: OKAY.  NOW, YOU INDICATED THAT

14           YOU DON'T TYPICALLY LIKE TO USE YOUR

15      CANINE IF OTHERS ARE THERE.  WOULD YOU

16      EXPLAIN THAT TO ME?  BECAUSE I'M JUST TRYING

17      TO UNDERSTAND --

18      THE WITNESS: YES, SIR.

19      THE COURT: -- WHAT THAT -- HOW THAT -- THE

20           PRESENCE OF SOMEONE ELSE COULD AFFECT

21      YOUR CANINE'S ABILITY TO DETECT DRUGS.

22      THE WITNESS: IT DOESN'T NECESSARILY.  IT'S

23           MORE OF A -- KIND OF A PET PEEVE OF

24      MINE.  IF WE'RE GOING TO USE THE CANINE, IT'S

25      NORMALLY, INITIALLY, RIGHT AWAY, BEFORE -- AS

1        THE VEHICLE IS, HOW WE STOP IT.  THE FIRST

2        THING I DO IS GO RUN MY DOG.  ONCE OFFICERS

3        START SEARCHING EVERYTHING, THEY START

4        OPENING THE DOORS.  WHEN I DO THE SEARCH WITH

5        MY CANINE I HAVE ALL THE DOORS CLOSED, THE

6        TRUNK CLOSED AND EVERYTHING. I DON'T WANT

7        ANYTHING OPEN.

8            IT'S MORE OF A -- LIKE I SAID, A PET

9        PEEVE.  BECAUSE WHEN I HAVE TWO OFFICERS UP

10       THERE SEARCHING A CAR, THEY HAVE ALL THE

11       DOORS OPEN AND I COME WALKING UP WITH MY DOG

12       AND I'M LIKE, "HEY, GUYS, I WANT TO RUN THE

13       DOG ON IT."  WELL, IT'S JUST -- IT'S NOT -- I

14       GUESS FLUID, BECAUSE EVERYBODY HAS TO STOP

15       WHAT THEY'RE DOING, SHUT THE DOORS.  BECAUSE

16       THEY CAN'T BE THERE IN THE VEHICLE WHILE THE

17       DOG'S SEARCHING.  SO, THEY GOT TO STOP WHAT

18       THEY'RE DOING, SHUT THEIR DOORS, STEP AWAY

19       FROM THE CAR AND THEN LET ME COME IN AND DO

20       IT.

21           SO, IT BASICALLY -- IT PUTS A STOPPING

22       POINT IN THEIR SEARCH.

23       THE COURT: SO, WAS THE SEARCH UNDERWAY BY

24           THAT POINT?

25       THE WITNESS: YES, SIR.  WHEN I FIRST

USA VS. JESSE A. BURCHAM, SUPPRESSION HEARING, 8-8-16   87

1              ARRIVED, THE SEARCH WAS ALREADY

2         UNDERWAY.

3         THE COURT: ALL RIGHT.  THAT'S ALL I HAVE

4              FOR YOU, CORPORAL.  THANK YOU SO MUCH

5         FOR COMING IN TODAY.  YOU ARE EXCUSED.

6         THE WITNESS: THANK YOU.

7         THE COURT: ALL RIGHT.  ANY ADDITIONAL

8              WITNESSES?

9         MR. FLOWERS: YES, YOUR HONOR.

10         THE COURT: OKAY.

11         MR. FLOWERS: THE UNITED STATES CALLS

12              BRAD BICKHAM.

13         THE CLERK: RAISE YOUR RIGHT HAND.

14 THE WITNESS, BRAD BICKHAM, AFTER HAVING FIRST BEEN

15 DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND

16 NOTHING BUT THE TRUTH, TESTIFIED AS FOLLOWS:

17         THE CLERK: STATE AND SPELL YOUR NAME

18              FOR THE RECORD.

19         THE WITNESS: BRAD BICKHAM, B-R-A-D

20              B-I-C-K-H-A-M.

21                   DIRECT EXAMINATION

22 MR. FLOWERS:

23 Q.  GOOD MORNING, OFFICER BICKHAM.

24         WHO DO YOU CURRENTLY WORK FOR?

25 A.  BATON ROUGE CITY POLICE.

**CLARE SMITH-NEELY, CERTIFIED COURT REPORTER (225) 389-3565**

1   Q.   AND WHAT DO YOU DO WITH BATON ROUGE CITY POLICE?

2   A.   I'M ASSIGNED TO THE INTERSTATE ON HIGHWAY

3        INTERDICTION.

4   Q.   OKAY.  AND WHAT DO YOU DO AS PART OF THAT HIGHWAY

5        INTERDICTION TEAM?

6   A.   WE GO ON THE INTERSTATE FOR TRAFFIC AND IF WE SEE

7        SOMETHING FURTHER THAT NEEDS TO BE LOOKED INTO

8        WHILE ON THE TRAFFIC, WE'LL LOOK INTO IT.

9   Q.   AND HOW LONG HAVE YOU BEEN ON THAT TEAM?

10  A.   ALMOST THREE YEARS.

11  Q.   AND HOW LONG HAVE YOU BEEN WITH BATON ROUGE CITY

12       POLICE?

13  A.   SINCE 2011.

14  Q.   OKAY.  AND WERE YOU WORKING INTERDICTION ON MAY

15       3RD OF 2015?

16  A.   YES, SIR.

17  Q.   DO YOU RECALL A STOP THAT INVOLVED JESSE BURCHAM?

18  A.   YES, SIR.  OFFICER JENKINS' STOP.

19  Q.   OKAY.  AND WERE YOU INVOLVED WITH THAT STOP?

20  A.   VERY LITTLE, BUT I WAS THERE.

21  Q.   OKAY.  AND HOW DID YOU BECOME INVOLVED IN THAT

22       STOP?

23  A.   I PULLED UP ON THE SIDE OF OFFICER JENKINS WHILE

24       HE WAS OUT TALKING TO BURCHAM.  AND I WAS PARKED

25       ON THE SIDE OF HIM.  AND WHEN I WAS PULLING UP,

1      HE WAS ASKING BURCHAM FOR CONSENT TO SEARCH.  AND
2      WHEN BURCHAM GAVE HIS CONSENT TO SEARCH THE
3      VEHICLE, I GOT OUT OF THE CAR AND STOOD ON THE
4      SIDE OF BURCHAM WHILE HE SEARCHED THE VEHICLE.
5  Q.  SO, HOW DID YOU -- DID YOU HAPPEN TO PASS BY OR
6      WERE YOU CALLED OUT THERE?
7  A.  NO.  WE ALL WORK OUT THERE TOGETHER.  AND I SEEN
8      HE WAS STOPPED AND THAT'S SOMETHING WE DO.  AND
9      IF I SEE AN OFFICER, NOT EVEN ONE OF OUR
10      INTERDICTION OFFICERS, ANY OFFICER, AN OFFICER IS
11      STOPPED, I'M GOING TO PULL OVER TO CHECK ON THEM
12      AND MAKE SURE THEY'RE ALL RIGHT.
13  Q.  OKAY.  SO, YOU SAID YOU PULLED UP AND YOU NOTICED
14      WHAT WHEN YOU GOT THERE?
15  A.  HE WAS OUT TALKING.
16  Q.  OKAY.  AND YOU SAID YOU HEARD HIM ASKING FOR
17      CONSENT?
18  A.  YES, SIR.
19  Q.  OKAY.  WHAT DID YOU HEAR EXACTLY?
20  A.  HE ASKED HIM -- NOW, I DON'T KNOW EXACT WORDS HE
21      USED.  BUT HE WAS ASKING PERMISSION TO SEARCH HIS
22      VEHICLE.
23  Q.  OKAY.  AND COULD YOU TELL IF MR. BURCHAM GAVE
24      CONSENT TO SEARCH THE VEHICLE?
25  A.  YES, SIR.  HE DID.  AND THAT'S -- AS SOON AS HE

1    DID, I STEPPED OUT.

2 Q.  OKAY.  AND WHAT DID YOU DO ONCE YOU STEPPED OUT?

3 A.  I JUST STOOD BY MR. BURCHAM AT THE FRONT OF THE

4    CAR WHILE OFFICER JENKINS AND COWART STARTED

5    SEARCHING THE VEHICLE.

6 Q.  OKAY.  WAS OFFICER COWART ALREADY THERE?

7 A.  IF HE WASN'T, HE PULLED UP LIKE SHORTLY AFTER --

8    RIGHT BEFORE THEY STARTED SEARCHING THE CAR.

9 Q.  OKAY.  AND WHEN YOU SAID THAT YOU WERE STANDING

10    WITH MR. BURCHAM IN FRONT OF THE VEHICLE.  WHICH

11    VEHICLE WAS THAT?

12 A.  OFFICER JENKINS.

13 Q.  OKAY.  AND WHERE WAS OFFICER JENKINS' VEHICLE

14    LOCATED?

15 A.  I'D SAY GIVE OR TAKE TEN FEET BEHIND BURCHAM'S

16    VEHICLE.

17 Q.  OKAY.  AND WHAT, IF ANYTHING, DID YOU DO WITH

18    HIM, MR. BURCHAM, WHILE YOU WERE STANDING THERE?

19 A.  WE JUST STOOD THERE.  YOU KNOW, WE WERE JUST --

20    HE WAS JUST TALKING, TELLING ME ABOUT HIS PRIOR

21    MILITARY EXPERIENCE.

22 Q.  OKAY.  AND WHY DO YOU -- WHY DID YOU DO THAT? WHY

23    DID YOU STAND THERE WITH HIM?  WHY DIDN'T YOU

24    START SEARCHING WITH THE OTHER OFFICERS?

25 A.  BECAUSE, FOR OFFICER SAFETY.  IF WE HAVE MORE

1    THAN ONE OFFICER, THE OTHER OFFICER STANDS WITH

2    THE PERSON THAT'S BEING STOPPED WHILE THE VEHICLE

3    IS SEARCHED -- WHILE THEY'RE SEARCHING THE

4    VEHICLE.

5  Q.  OKAY.  WAS MR. BURCHAM IN HANDCUFFS AT THIS

6    POINT?

7  A.  NO.

8  Q.  OKAY.  AT ANY TIME DID THAT CHANGE, WAS HE PLACED

9    IN HANDCUFFS?

10  A.  YES, SIR.  AFTER THE -- I'M NOT SURE WHICH ONE.

11    ONE OF THE OFFICERS HAD NOTICED WHAT APPEARED TO

12    HIM TO BE AN AFTER-MARKET COMPARTMENT UNDER THE

13    REAR BUMPER AREA OF THE VEHICLE.  AND THEY -- AS

14    SOON AS THEY NOTICED IT, THEY IMMEDIATELY GOT UP

15    AND WALKED OVER THERE AND READ HIM HIS RIGHTS AND

16    PUT HIM IN HANDCUFFS AND ADVISED HIM HE WAS BEING

17    DETAINED.

18  Q.  OKAY.  AND DO YOU RECALL IF YOU NOTICED ANYTHING

19    ABOUT MR. BURCHAM'S DEMEANOR AT THAT POINT OR

20    ANYTHING THAT HE SAID?

21  A.  HE GOT REAL QUIET.

22  Q.  OKAY.

23  A.  HE WENT -- LIKE WHEN WE WAS THERE, WE WAS JUST --

24    JUST TALKING NORMALLY.  LIKE IF YOU JUST MET

25    SOMEBODY. HE WAS TELLING ME ABOUT HIS IRAQ AND

1    EVERYTHING.  AND THEN WHEN THE OFFICERS READ HIM

2    HIS RIGHTS, HE JUST GOT QUIET.

3  Q.  OKAY.  WHAT HAPPENED NEXT?

4  A.  THE VEHICLE -- AFTER THEY READ HIM HIS RIGHTS,

5    TOLD HIM HE WAS DETAINED, THE VEHICLE WAS

6    TRANSPORTED TO OUR OFFICE.

7  Q.  OKAY.  DO YOU RECALL IF THERE WAS A CANINE SEARCH

8    PERFORMED AT ANY POINT?

9  A.  NOT ON THE INTERSTATE.  I DON'T RECALL.  I'D HAVE

10    TO GO BACK TO THE REPORT.  IT'S BEEN A WHILE.

11  Q.  OKAY.  ALL RIGHT.  SO, ONCE YOU GET BACK TO THE

12    -- WHERE WAS THE VEHICLE TRANSPORTED AGAIN?

13  A.  TO OUR OFFICE.

14  Q.  AND WHERE IS "OUR OFFICE"?

15  A.  OFF OF ACADIAN.

16  Q.  OKAY.  AND IS THAT THE BRPD OFFICE OR ---

17  A.  THAT'S THE DEA HIDTA OFFICE.

18  Q.  OKAY.  SO, ONCE -- WHAT HAPPENED ONCE YOU ALL GOT

19    BACK TO THE HIDTA OFFICE?

20  A.  ONCE THEY GOT BACK TO THE HIDTA OFFICE, OFFICER

21    COWART AND OFFICER JENKINS WENT TO DO FURTHER

22    INVESTIGATION WHERE THE COMPARTMENT WAS AND

23    THAT'S WHEN THEY OBSERVED THE 12 KILOS IN THE

24    BUMPER.

25  Q.  OKAY.  THEN WHAT HAPPENED?

1  A.   THEY WENT UP TO BURCHAM AND ADVISED HIM HE WAS

2       UNDER ARREST NOW.

3  Q.   OKAY.  AND AFTER HE WAS ADVISED HE WAS UNDER

4       ARREST WHAT HAPPENED?

5  A.   THEY WENT -- AFTER THEY RETRIEVED THE COCAINE,

6       THEY WENT UP IN THE OFFICE AND WHEN WE WAS IN THE

7       OFFICE HE NEEDED TO GO TO THE RESTROOM, SO I

8       BROUGHT HIM TO THE RESTROOM.  BECAUSE WE DON'T

9       LET THEM GO BY THEMSELF.  AND RIGHT BEFORE HE

10       USED THE RESTROOM, HE REACHED INTO HIS POCKET AND

11       HE SAID, "HERE, THEY FORGOT THIS."  IT WASN'T

12       MUCH.  IT WAS A LITTLE PERSONAL USE.  IT WAS

13       WHITE POWDER.

14  Q.   OKAY.  AND HE JUST GAVE THAT TO YOU?

15  A.   YES, SIR.

16  Q.   OKAY.  AND THEN WHAT HAPPENED AFTER THAT?

17  A.   THEY JUST FINISHED HIS -- I DON'T ACTUALLY KNOW

18       WHO INTERVIEWED HIM, THE OFFICER'S NAME.  BUT

19       AFTER THAT, WE -- THEY JUST DID HIS PAPERWORK AND

20       TRANSPORTED HIM.

21  Q.   OKAY.  THIS SUBSTANCE THAT HE PULLED OUT OF HIS

22       POCKET AND GAVE TO YOU, DO YOU RECALL WHETHER

23       THAT WAS TESTED AT SOME POINT?

24  A.   I DON'T KNOW IF IT WAS TESTED THERE OR IT WAS

25       BROUGHT TO THE LAB.

1   Q.   OKAY.

2   A.   IT WAS DROPPED AS EVIDENCE.

3   Q.   OKAY.  AND ARE YOU AWARE OF THE RESULTS OF THAT

4        TEST?

5   A.   I'M UNAWARE.

6   Q.   OKAY.

7            MR. FLOWERS: I HAVE NO FURTHER QUESTIONS,

8                 YOUR HONOR.

9            THE COURT: ANY CROSS EXAMINATION?

10                 CROSS EXAMINATION

11  MR. DIGIULIO:

12  Q.   OFFICER BICKHAM, HOW ARE YOU?  JOHN DIGIULIO,

13       REPRESENTING MR. BURCHAM.

14  A.   HOW YOU DOING?

15  Q.   YOU INDICATED THAT YOU JUST HAPPENED TO BE

16       PASSING, YOU DIDN'T HEAR A RADIO CALL OR ANYTHING

17       ABOUT THIS STOP?

18  A.   NO.  WE ALL WORK OUT THERE TOGETHER AND WE'RE

19       CLOSE.  AND I HEARD HIM GO OUT WITH THE STOP.

20       AND THEN -- SO SHORTLY LATER I JUST RODE UP,

21       PULLED UP ON THE SIDE OF HIM.

22  Q.   OKAY.  SO, YOU DID HEAR HIM ON THE RADIO TALKING

23       ABOUT HIS STOP?

24  A.   YES.

25  Q.   OKAY.

1  A.   HE JUST SAID -- HE WAS NOT TALKING ABOUT IT.

2       JUST SAYING HE WAS GOING OUT WITH A VEHICLE.

3  Q.   AND YOUR UNIT DOESN'T USE ANY KIND OF LOGS OR

4       RECORDING OF ANY OF THESE TRANSACTIONS,

5       COMMUNICATIONS?

6  A.   NOT OUR RADIO.  OUR ONLY LOG RECORDINGS THAT WE

7       HAVE WOULD BE OUR CAMERAS.  BUT THAT -- WE HAVE

8       ABOUT A THREE OR FOUR-MONTH TIME PERIOD.  OUR

9       CAMERA SYSTEM WAS REAL OLD AND OUTDATED AND THEY

10      ALL WENT DOWN.  AND AT THAT TIME WE WAS IN THE

11      PROCESS OF GETTING NEW CAMERAS, WHICH WE ALL HAVE

12      NOW.

13 Q.   SO, AT THE TIME NOBODY HAD CAMERAS OR NOBODY HAD

14      CAMERAS THAT WORKED; IS THAT WHAT YOU'RE SAYING?

15 A.   AT THAT TIME.

16 Q.   OKAY.  AND SO YOU WERE -- WHILE THEY WERE

17      SEARCHING, YOU WERE STANDING NEXT TO MR. BURCHAM?

18 A.   YES, SIR.

19 Q.   AND HE WAS TELLING YOU ABOUT HIS TIME IN IRAQ?

20 A.   YES, SIR.

21 Q.   TOURS OF DUTY IN IRAQ?

22 A.   YES, SIR.

23 Q.   ANYTHING ELSE YOU REMEMBER YOU WERE TALKING

24      ABOUT?

25 A.   THAT'S PRETTY MUCH IT.

USA VS. JESSE A. BURCHAM, SUPPRESSION HEARING, 8-8-16   **96**

1  Q.   OKAY.  AND DID YOU PARTICIPATE IN THE SEARCH BACK

2       AT THE DEA --

3  A.   NO, SIR.

4  Q.   -- HEADQUARTERS?

5  A.   NO.

6  Q.   OKAY.  AND DID YOU PUT THE HANDCUFFS ON MR.

7       BURCHAM OR SOMEBODY ELSE DID THAT?

8  A.   I DIDN'T.  YOU'D HAVE TO REFER TO THE REPORT.  I

9       WOULD EITHER SAY IT WOULD HAVE TO BE OFFICER

10      JENKINS OR COWART PUT THE HANDCUFFS ON HIM.  ONE

11      OF THEM.

12 Q.   ALL RIGHT.  DID YOU ADVISE HIM OF HIS RIGHTS?

13 A.   NO, SIR.  IT WAS EITHER OFFICER JENKINS OR COWART

14      DID.

15 Q.   ALL RIGHT.  THANK YOU.

16           MR. DIGIULIO: THAT'S ALL.

17           THE COURT: ANY REDIRECT?

18           MR. FLOWERS: NOTHING, YOUR HONOR.

19           THE COURT: OKAY.  AND, OFFICER, I DON'T

20             HAVE ANY QUESTIONS FOR YOU.  THANK YOU

21           FOR COMING IN TODAY.

22           THE WITNESS: THANK YOU.

23           THE COURT: AGAIN.  OKAY.  ALL RIGHT.

24             ANY ADDITIONAL WITNESSES?

25           MR. FLOWERS: NO, YOUR HONOR.

1      THE COURT: OKAY.  I WILL -- DOES THE

2           DEFENSE HAVE ANY EVIDENCE TO PRESENT?

3      MR. DIGIULIO: NO, YOUR HONOR.

4      THE COURT: ALL RIGHT.  LET ME GIVE YOU AN

5           OPPORTUNITY TO ARGUE THE MATTER, MR.

6      FLOWERS, IF YOU'D LIKE TO DO SO.

7      MR. FLOWERS: YOUR HONOR, I WAS GOING TO

8           REQUEST THAT WE HAVE AN OPPORTUNITY TO

9      DO A POST-HEARING BRIEF.  THERE HAVE BEEN

10     SOME FACTS ELICITED TODAY IN COURT THAT ARE

11     MORE DETAILED THAN I WAS AWARE OF BEFORE.

12     AND I THINK MAY CHANGE A LITTLE BIT OF THE

13     ANALYSIS OF THE LAW AND WHAT I ORIGINALLY

14     ARGUED AND MY RESPONSE TO THE MOTION.

15     THE COURT: OKAY.  MR. DIGIULIO, YOU DON'T

16          HAVE ANY QUARREL WITH THAT?

17     MR. DIGIULIO: I DON'T HAVE ANY -- NO.

18          AS LONG AS WE GET TO RESPOND, YOUR

19     HONOR.

20     THE COURT: OKAY.  ABSOLUTELY.  WELL, WHAT

21          I'M PREPARED TO DO IS, AS MY CUSTOM, IS

22     TO ORDER SIMULTANEOUS BRIEFING.  I DON'T --

23     WHAT I DON'T WANT TO GO FORWARD WITH POST-

24     HEARING BRIEF AND THEN --

25     MR. DIGIULIO: RIGHT.

1      THE COURT:  -- A REPLY AND THEN A SUR-REPLY

2           AND ALL THAT SORT OF THING.

3           SO, WHAT I'M INCLINED TO DO IS TO GO ON

4      AND GIVE YOU A DEADLINE FOR THE SUBMISSION

5      AND FILINGS OF POST-HEARING BRIEFS.  AND I'M

6      GOING TO LIMIT IT TO SIX PAGES, NO MORE THAN

7      SIX PAGES, PER SIDE.  AND THAT WILL INCLUDE,

8      OF COURSE, THE CAPTION PAGE AS WELL AS THE

9      SIGNATURE PAGE.

10          LET'S SEE NOW.  ALL RIGHT.  NOW, LET ME

11     ASK YOU, MR. DIGIULIO.  WITH RESPECT TO THE

12     MOTION TO COMPEL DISCOVERY, YOU'VE HEARD

13     TESTIMONY THAT -- MUCH OF WHICH YOU'RE

14     SEEKING MAY NOT EXIST.

15     MR. DIGIULIO: YES, YOUR HONOR.  AND I MAY

16          MAKE SOME ARGUMENTS DIRECTED AT THAT

17     IN THE MEMORANDUM ---

18     THE COURT: OKAY.

19     MR. DIGIULIO: AND I THINK IT'S TELLING THAT

20          THEY DON'T EXIST.  SO.

21     THE COURT: ALL RIGHT.  OKAY.  WELL, I'LL

22          GIVE YOU AN OPPORTUNITY TO ADDRESS BOTH.

23     BUT, AGAIN, STILL WITHIN THAT --

24     MR. DIGIULIO: SIX.

25     THE COURT:  -- THAT SIX PAGES.

1      MR. DIGIULIO: YES, SIR.

2      THE COURT: OKAY?

3      MR. DIGIULIO: I UNDERSTAND.

4      THE COURT: ALL RIGHT.  LET'S SEE.

5          PAM, LET ME SEE YOU.

6      REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

7          AN OFF-THE-RECORD DISCUSSION WAS HELD.)

8      REPORTER'S NOTE: (DISCUSSION WAS CONCLUDED.)

9      THE COURT: ALL RIGHT.  GENTLEMEN, DOES

10         EITHER SIDE INTEND TO REQUEST

11     TRANSCRIPTS OF THE HEARING?

12     MR. FLOWERS: I WOULD LIKE TO REQUEST A

13         TRANSCRIPT, YOUR HONOR.

14     THE COURT: ALL RIGHT.  OKAY.  WELL,

15         I'M GOING TO SET SOME FILING DEADLINES

16     THAT WILL CONSIDER THE TIME TO PREPARE THE

17     TRANSCRIPTS.

18         CLARE, LET ME SEE YOU.

19     REPORTER'S NOTE: (THEREFORE, AT THIS

20         TIME AN OFF-THE-RECORD DISCUSSION WAS

21         HELD.)

22     REPORTER'S NOTE: (DISCUSSION WAS CONCLUDED.)

23     THE COURT: ALL RIGHT, GENTLEMEN.  WHAT I'LL

24         DO.  IF YOU INTEND TO ORDER THE

25     TRANSCRIPT, LET ME ASK YOU TO DO THAT

1         IMMEDIATELY. AND, SO, I'LL GIVE YOU A LITTLE

2         BIT MORE TIME. I WILL ASK THAT YOUR POST-

3         HEARING BRIEFS BE FILED ON OR BEFORE THE

4         FRIDAY, AUGUST 26TH, BY FIVE O'CLOCK. THAT

5         SHOULD GIVE YOU MORE THAN ENOUGH TIME TO

6         OBTAIN EVERYTHING YOU NEED AND TO MAKE YOUR

7         BEST ARGUMENTS WITHIN THE SIX-PAGE TIME

8         LIMITS. OKAY?

9            MR. BURCHAM, PLEASE STEP TO THE FORWARD

10        PODIUM WITH YOUR LAWYER.

11           NOW, MR. BURCHAM, YOU HAVE BEEN PRESENT

12        IN COURT THROUGHOUT THIS HEARING. YOU

13        UNDERSTAND THAT I HAVE ORDERED THAT POST-

14        HEARING BRIEFS BE FILED IN YOUR CASE. DO YOU

15        HAVE ANY QUESTIONS ABOUT ANYTHING, SIR?

16        MR. BURCHAM: NO, YOUR HONOR.

17        THE COURT: ALL RIGHT. LET ME SIMPLY REMIND

18           YOU, SIR, OF THE IMPORTANCE OF

19        CONTINUING TO ABIDE BY THE CONDITIONS OF YOUR

20        PRE-TRIAL RELEASE THAT WERE SET BY THE

21        MAGISTRATE JUDGE. AND I WILL WARN YOU AGAIN

22        THAT IF IT IS CALLED TO MY ATTENTION THAT YOU

23        HAVE FAILED TO ABIDE BY EACH OF THOSE

24        CONDITIONS, I WILL BE FORCED TO ORDER YOUR

25        ARREST AND WILL ORDER THAT YOU BE DETAINED IN

1          THE CUSTODY OF THE MARSHAL SERVICE.  DO YOU

2          UNDERSTAND THAT, SIR?

3          MR. BURCHAM: YES, YOUR HONOR.

4          THE COURT: ALL RIGHT.  ANY QUESTIONS ABOUT

5              ANYTHING?

6          MR. BURCHAM: NO, YOUR HONOR.

7          THE COURT: ALL RIGHT.  GENTLEMEN, ANYTHING

8              FURTHER?

9          MR. DIGIULIO: NO, YOUR HONOR.  I WONDERED

10             WHEN WE COULD EXPECT THE TRANSCRIPTS?

11         JUST -- NOT TO PUT ANY PRESSURE ON ANYBODY.

12         AND WHAT I NEED TO DO TO MAKE SURE WE GET A

13         COPY.

14         THE COURT: YES.  THE TRANSCRIPTS SHOULD BE

15             AVAILABLE IN APPROXIMATELY SEVEN DAYS.

16         BUT I WOULD INVITE YOU TO REMAIN --

17         MR. DIGIULIO: SURE.

18         THE COURT:  -- AND TO SPEAK TO THE COURT

19             REPORTER ABOUT THAT.

20         MR. DIGIULIO: ALL RIGHT.  THANK YOU, JUDGE.

21         THE COURT: ANYTHING FURTHER?

22         MR. FLOWERS: NOTHING FROM THE GOVERNMENT,

23             YOUR HONOR.

24         THE COURT: ALL RIGHT.  THANK YOU, GENTLEMEN.

25             COURT IS ADJOURNED.

1

2                          C E R T I F I C A T E

3

4              I CERTIFY THAT THE FOREGOING IS A CORRECT

5      TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN

6      THE ABOVE-ENTITLED NUMBERED MATTER.

7

8                      S/Clare Smith-Neely

9      _____

10             CLARE SMITH-NEELY, CCR

11             OFFICIAL COURT REPORTER

12

13

14

15

16